NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.



SUPREME COURT OF GEORGIA
Case No. S24A0333

June 27, 2024

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

ERICA CLAUDETTE WHITE v. THE STATE.

Upon consideration, the Court has revised the deadline for motions for reconsideration in this matter. It is ordered that a motion for reconsideration, if any, including motions submitted via the Court's electronic filing system, must be **received in the Clerk's Office by 12:00 p.m. on Friday, July 5, 2024**.

**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

_____, Clerk

In the Supreme Court of Georgia

Decided: June 27, 2024

S24A0333.  WHITE v. THE STATE.

WARREN, Justice.

In February 2018, Erica Claudette White was convicted of malice murder and other crimes in connection with the November 2014 death of her son, Tyrael McFall ("Tyrael"), whom the State alleged died from codeine poisoning.[1]  She appeals those convictions,

_____

[1] Tyrael died on November 8, 2014.  On August 25, 2017, a Cobb County grand jury indicted White and her boyfriend, Michael Robert Schullerman, for malice murder (Count 1), felony murder predicated on aggravated battery (Count 2), aggravated battery (Count 3), making a false statement (Counts 4 and 6), identity fraud (Counts 5, 7, and 8), financial-transaction card fraud (Counts 9 through 14), forgery in the second degree (Count 15), and violating the Racketeer Influenced and Corrupt Organizations Act, OCGA § 16-14-4 (c) (Count 16). Schullerman pled guilty to Counts 4 through 16 on December 4, 2017, and the State dismissed the other charges against him.  On February 5, 2018, a jury found White guilty on all counts.  Regarding Count 16, the jury found that all but two of 37 overt acts listed in Count 16 constituted a pattern of racketeering activity under OCGA § 16-14-4.  On February 7, 2018, the trial court sentenced White to serve life in prison without the possibility of parole for malice murder (Count 1), 5 years in prison for each count of making a false statement (Counts 4 and 6), 10 years in prison for each count of identity fraud (Counts 5, 7, and 8), 3 years in prison for each count of financial-transaction

1

contending that the trial court abused its discretion by denying her motion for new trial on the general grounds; admitting photographs from Tyrael's autopsy; and denying her motion to sever certain counts in the indictment. White also claims that the trial court erred by denying her general and special demurrers; motion for new trial on the grounds that her trial counsel rendered ineffective assistance of counsel; and motion for new trial on the basis that the State committed a *Brady* violation. See *Brady v. Maryland*, 373 U.S. 83 (83 SCt.1194, 10 LEd2d 215) (1963). For the reasons explained below, White's claims fail and we affirm her convictions.

1. As relevant to her claims on appeal, the evidence presented at White's trial showed the following. In 2012, White married

---

card fraud (Counts 9 through 14), 5 years in prison for forgery in the second degree (Count 15), and 20 years in prison for violating the Racketeer Influenced and Corrupt Organizations Act (Count 16), with Counts 4 through 16 to be consecutively served. The felony murder count (Count 2) was vacated by operation of law. The aggravated battery count was merged into Count 1. White timely moved for a new trial on February 19, 2018, and then filed an amended motion for new trial on May 28, 2021. On September 20, 2023, after an evidentiary hearing, the trial court denied White's motion for new trial, as amended. White timely filed a notice of appeal on September 27, 2023. This case was docketed to the term of this Court beginning in December 2023 and submitted for a decision on the briefs.

Joseph McFall ("Joseph"), and in August of that year, Tyrael was born. Only weeks after Tyrael's birth, Joseph inflicted blunt-force trauma to Tyrael's head, causing severe and permanent brain damage. The injuries prevented Tyrael from learning how to walk and talk. He suffered frequent seizures and received food and medicine through a feeding tube. In April 2014, Joseph was convicted of aggravated battery for this abuse. While Joseph was incarcerated, White became Tyrael's exclusive caretaker and expressed in a crime victim-impact statement before a court that Tyrael's condition restricted her ability to travel and work because it "limited . . . what job locations [she could] go to."

Around that time, White and Michael Schullerman began a romantic relationship. Within a few months, Schullerman moved into the same house as White and Tyrael in Austell. White and Schullerman shared the tasks involved in caring for Tyrael, including preparing and administering his medicines. Part of that process included grinding Tyrael's pills before inserting them into his feeding tube.

3

1. *Events Leading Up to Tyrael's Death*

(a) *White's 911 Call Pertaining to Her Own Health.* On November 2, 2014, at 5:56 p.m., Schullerman called 911, complaining that White had a 103-degree fever and was having trouble breathing. Paramedics arrived at White's home and at 6:12 p.m. recorded White's body temperature as 100 degrees. However, when White was transported to the emergency room, Dr. Nauman Rashid recorded White's body temperature as 98.8 degrees. Dr. Rashid diagnosed White with a urinary tract infection ("UTI") and prescribed "Tylenol 3" to White, one tablet of which contains 30 milligrams of codeine.

At 11:22 a.m. on the day after White's emergency room visit, Schullerman's cell phone called White's cell phone. Two minutes later, White, Schullerman, or one of White's family members[2] retrieved White's Tylenol 3 prescription from the pharmacy,

_____

[2] Evidence was presented that White, Schullerman, White's daughter (Sierra Monroe), and White's mother retrieved each other's prescriptions from the family's preferred pharmacy.

although the pharmacy did not have a record showing who retrieved it.[3] Whoever retrieved it, however, purported to sign White's name to satisfy the pharmacy's electronic-signature requirement.

(b) *Tyrael's Ongoing Medical Difficulties and Death.* On November 5—three days after White's UTI diagnosis—Dr. Joshua Chern implanted a nerve stimulator in Tyrael's neck at Children's Healthcare of Atlanta to lessen the frequency and mitigate the pain of Tyrael's seizures. Dr. Chern discharged Tyrael from the hospital on the day of the procedure. Tyrael did not receive any codeine from Children's Healthcare on November 5, although he was given liquid oxycodone to help with pain from the procedure.

On the evening of November 8, White asked her daughter, Sierra, and Sierra's husband to babysit Tyrael while she and Schullerman went to a shooting range where White was a member. At trial, Sierra testified that, just after she arrived at White's home at about 7:30 p.m., she saw Schullerman prepare and administer

---

[3] Although White was prescribed Tylenol 3 for the UTI, the pharmacist's testimony was unclear as to whether the prescription was filled with Tylenol 3 or Tylenol 4. One tablet of Tylenol 4 contains 60 milligrams of codeine.

Tyrael's medicine while White was nearby. White encouraged Sierra to lie in bed with Tyrael while she and Schullerman were at the shooting range. White and Schullerman left their home that evening at approximately 8:00 p.m.

When they arrived at the shooting range, White and Schullerman purchased ammunition and targets. Schullerman later stated that he and White each shot approximately 50 rounds of ammunition that night. However, the shooting range owner testified that she had no record showing that White and Schullerman were placed in a firing lane that night, indicating that they did not fire any guns during their visit. Although it is unclear exactly what White and Schullerman did while they were at the shooting range, evidence showed that White called Sierra multiple times to ask if she had checked on Tyrael. White and Schullerman returned home at around 9:30 p.m. that evening and Sierra and her husband left at approximately 10:00 p.m.

At 10:44 p.m., White called 911, yelling that "[her] baby's not breathing." The operator asked, "[I]f I get somebody on the line that

can instruct you in CPR, do you think you could follow the directions?" White screamed "no" in response. During the 911 call, White left Tyrael with Schullerman, ran across the street to her mother's house, and screamed, "Tyrael's dead." EMS arrived at 10:49 p.m. Tyrael was pronounced dead at 11:24 p.m., after he had been transported to the hospital.

The medical examiner concluded that "codeine toxicity" caused Tyrael's death, and she also reported a small amount of oxycodone in his blood consistent with the oxycodone dosages prescribed after Tyrael's November 5 surgery. At trial, a pharmacokinetics expert testified that 55 or 56 milligrams of codeine—or two tablets of Tylenol 3—could induce respiratory arrest in a child of Tyrael's size, with the peak effect of toxicity occurring between 1.5 and 4 hours after ingestion.

During the investigation into Tyrael's death, Detective Christoper Payne asked White how codeine could have gotten into Tyrael's body. White stated that she "didn't know what codeine was until this all happened." She also claimed that "I've never had it

7

prescribed to me" and that she had "no access to it." "White also told Detective Payne that she had some form of codeine prescribed to her *after* Tyrael died, but she did not "have it filled" because she "just [did] not take that kind of stuff." White did not recall going to the emergency room six days earlier on November 2 and receiving a prescription for Tylenol 3 until Detective Payne specifically asked about it. White added that she "did not have [that Tylenol 3 prescription] filled." And when Detective Payne asked White if the signature provided to retrieve that Tylenol 3 prescription was hers, she—at various times—said that she remembered signing for it and did not remember signing for it.

2. *White's Trial*

The State ultimately charged White and Schullerman with Tyrael's murder, among other crimes. At trial, the State contended that White and Schullerman poisoned Tyrael with Tylenol 3, alleging that White feigned a UTI and obtained a Tylenol 3 prescription under false pretense. To support that contention, Dr. Rashid testified that a person's body temperature could "not likely"

8

drop 3 degrees in 16 minutes—the period between Schullerman's 911 call and the EMT recording of White's temperature—"[w]ithout intervention" and "probably [could] not" decrease from 103 to 98.8 degrees between the time Schullerman reported White's temperature to the 911 operator and Dr. Rashid's recording of her temperature at the emergency room. The State further argued that White was motivated to murder Tyrael because she no longer wanted to be encumbered by him—financially, or with respect to the around-the-clock nature of the care that was required for him. To support its theory of motive, the State introduced the following evidence.

(a) *Credit-Card-Related Conduct.* In August 2014—approximately 3 months before Tyrael died—White used Tyrael's personal identifiers to activate a credit card and make transactions using that card. And in April 2015—approximately 6 months after Tyrael died—White used Tyrael's personal identifying information to activate at least two more credit cards. White and Schullerman used those credit cards to attempt (in some instances) and complete

9

(in other instances) transactions with several vendors during April and May of 2015.[4]

(b) *Additional Evidence of Financial Crimes.* In 2013, White secured a $50,000 life insurance policy on Tyrael's life that she sought to redeem after he died. The State contended that White made material omissions about Tyrael's medical condition in

---

[4] Count 5 alleged that White and Schullerman committed the offense of identity fraud, OCGA § 16-9-121, for the "April[] 2014" activation, using Tyrael's identifiers, of a Capital One Bank Mastercard ending in -6266. Count 16, overt act 3, incorporated Count 5. Count 16 alleged, in overt acts 35 and 36, that White and Schullerman presented the credit card ending in -6266 to make two purchases, but the card was declined. Count 7 alleged that White and Schullerman committed the offense of identity fraud, OCGA § 16-9-121, for the April 2015 activation, using Tyrael's identifiers, of a Citibank card ending in -8773. Count 9 alleged that White and Schullerman committed the offense of financial-transaction card fraud, OCGA § 16-9-33 (a) (1) (C), by using the Citibank card ending in -8773 to purchase electronics at Best Buy. Count 16, overt acts 7 and 9, incorporated Counts 7 and 9, respectively. Count 8 alleged that White and Schullerman committed the offense of identity fraud, OCGA § 16-9-121, for the April 2015 activation, using Tyrael's identifiers, of a Capital One Bank credit account ending in -2313. Counts 10 through 14 alleged that White and Schullerman committed the offense of financial-transaction card fraud, OCGA § 16-9-33 (a) (1) (C), for presenting the credit card ending in -2313 at vendors to make purchases. Count 16, overt acts 6 and 8 through 12, incorporated Counts 8 and 10 through 14, respectively. Additionally, Count 16 alleged, in overt acts 32 through 34 and 37, that White and Schullerman presented the credit card ending in -2313 at vendors to make purchases, but the card was declined. Count 16 also alleged, as overt acts 26 through 29, that White and Schullerman applied for four other credit cards after Tyrael's death using Tyrael's identifiers, but their applications were declined.

10

applying for that policy, and alleged in the indictment—and contended at trial—that obtaining this policy was an overt act in furtherance of White and Schullerman's scheme to financially exploit Tyrael in death.

In March 2013, White submitted a grant application to the Brain and Spinal Injury Trust Fund Commission, which provides grants to Georgians who have suffered traumatic brain and spinal cord injuries, in which she falsely represented her total monthly income. Additionally, in September 2014, White fabricated a letter from a former employer that misrepresented her salary to support her application for a $10,000 grant from an entity that supports crime victims and their caregivers.

Also, two days after Tyrael died in 2014, White made a request with the Social Security Administration ("SSA") for Tyrael's benefits, for which he was eligible only while living, to be directly deposited into a different bank account than the bank account they were deposited into before Tyrael died. However, the SSA did not terminate benefits until the State of Georgia notified it of Tyrael's

11

death on May 20, 2015.

(c) *Additional Evidence of Motive.* The State presented evidence that White had told Sierra, "since [Sierra] was a child,"[5] that she would "smother" a "special-needs child" if she ever had one and then "blame it on a crib death." And the State also presented evidence that, after White was arrested for Tyrael's death, Judy Johnson, White's pod-mate at the Cobb County adult detention center, testified that White told fellow inmates that Tyrael "was in the way of her relationship with her boyfriend," "she couldn't have a life because [Tyrael] needed around-the-clock care," and that "she shouldn't have had to put up with something [Tyrael's] dad did to him. . . . [I]t was a burden" to her.[6]

---

[5] Sierra was 21 years old at the time of White's trial.

[6] At trial, additional evidence of White's statements during her time in custody was admitted into evidence. In particular, State's Exhibit 18 contained audio recordings of phone calls White made to family members while she was in custody at the Cobb County adult detention center, and portions of those phone calls were played for the jury. State's Exhibit 18 is not included in the record on appeal; however, neither party disputes its contents. We note that although the audio recordings contained in State's Exhibit 18 are not contained in the record on appeal, the record does contain trial testimony from Sierra characterizing her memory of some of the conversations she had with

12

Additionally, the State contended that a reason White was motivated to financially exploit Tyrael was to support a "drug habit." To help illustrate that theory, the State presented the testimony of a pharmacy technician who said that Schullerman presented her with a Xanax prescription purporting to be for White. Pharmacy records showed that the Xanax prescription was presented after Tyrael's death in May 2015. The pharmacy technician recalled that the incident caused her concern because there was a discrepancy in the prescription's formatting and Schullerman appeared to be "geeked out," or suffering from withdrawals. The psychiatrist whose prescription pad page Schullerman presented to fill the prescription testified that he conducted one session with Schullerman in 2015.

---

White while White was in custody at the Cobb County adult detention center. According to Sierra, White stated on a call to her that when White made calls from the detention center to Sierra using other inmates' phone numbers, that is "when we talk about how [Schullerman] did it." Sierra further testified that "it" referred to "the fraud," although the State contested that characterization during Sierra's cross-examination. Sierra also testified that she stated on a call with White that Sierra "[could not] remember if [Schullerman] pushed [the medicine] through," although Sierra testified at trial that she was "positive" she saw Schullerman push medicine through Tyrael's feeding tube on the night of his death. The record also contains testimony from Detective Payne regarding some of White's recorded calls to family members from the detention center.

When asked if the Xanax prescription was one that he wrote, the psychiatrist explained that "there's nothing about [the Xanax prescription] that fits . . . with what I would write," but that Schullerman would have had an opportunity during the session to "rifle through [the psychiatrist's] stuff" because the psychiatrist "was seeing two patients at the same time in two different rooms."[7] Additionally, to support its contention that White had a "drug habit," the State presented evidence that White told Detective Payne that she used cocaine.

White rejected the State's theory of motive and presented alternative explanations for Tyrael's death. On the one hand, White claimed she did not kill Tyrael by mistake or otherwise; she contended that Schullerman poisoned Tyrael with codeine. To support that contention, she argued that Schullerman retrieved the Tylenol 3 prescription from the pharmacy on November 3 and pointed to evidence that Schullerman misrepresented his

---

[7] The State contended that the jury could infer from this evidence that Schullerman stole the psychiatrist's prescription pad and later used it to fraudulently obtain Xanax.

whereabouts to Detective Payne. White also pointed to Sierra's testimony that she saw Schullerman prepare and administer Tyrael's medicine on the night he died.

Alternately, White argued that the medical examiner's pronouncement that "codeine toxicity" caused Tyrael's death was doubtful because the State's toxicologist testified that there was only a "toxic"—and not a "fatal"—level of codeine in Tyrael's blood. In support of that theory, White contended that Tyrael's body had "wore out" because he was having seizures more frequently, and his white blood cell count was low. She also cited the medical examiner's testimony that the medical examiner thought—before she received the toxicology results—that there was a "possibility" that Tyrael's body might have "g[iven] up."

2. White claims that the trial court abused its discretion by denying her motion for new trial on the "general grounds" set forth in OCGA §§ 5-5-20 and 5-5-21 as to the murder, felony murder, and aggravated battery counts (Counts 1 through 3). See *Drennon v. State*, 314 Ga. 854, 860 (880 SE2d 139) (2022) ("Even when the

15

evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is 'contrary to . . . the principles of justice and equity,' OCGA § 5-5-20, or if the verdict is 'decidedly and strongly against the weight of the evidence.' OCGA § 5-5-21.") (citation and punctuation omitted).  We disagree.

> When these so-called "general grounds" are properly raised in a timely motion for new trial, the trial judge must exercise a broad discretion to sit as a 'thirteenth juror.' . . . [T]he merits of the trial court's decision on the general grounds are not subject to our review, and the decision to grant a new trial on the general grounds is vested solely in the trial court.

*King v. State,* 316 Ga. 611, 616 (889 SE2d 851) (2023) (citation and punctuation omitted).  In denying White's motion for new trial, the trial court expressly stated that it had "exercised its discretion, weighed the evidence, considered the credibility of witnesses, and determined as the 'thirteenth juror' that the verdict was not against the weight of the evidence, and did not offend the principles of justice and equity."  This claim therefore presents nothing for our review.[8]

---

[8] White does not separately enumerate as error that the evidence for the murder, felony murder, and aggravated battery counts was insufficient under

*King*, 316 Ga. at 616.

3. White claims that the trial court abused its discretion by admitting five pre-incision autopsy photographs of Tyrael's body because they were not relevant under OCGA § 24-4-401 ("Rule 401 and unduly prejudicial under OCGA § 24-4-403 ("Rule 403"). White's claim fails.

At trial, White disputed the medical examiner's conclusion that codeine poisoning caused Tyrael's death, contending that other factors could have contributed to his death, such as his traumatic brain injury. The State authenticated autopsy photographs,

---

*Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LEd2d 560) (1979). Although we have often reviewed the sufficiency of the evidence as a matter of constitutional due process when an appellant raises a general-grounds claim on appeal, see *King*, 316 Ga. at 616 n.8, many of us question that approach and would be open to reexamining it in a case where the issue is properly presented. See id. ("[M]any of us question whether it is proper for this Court to import *Jackson* into an appellate review of the general grounds (or to otherwise rely on *Jackson* as part of that analysis)."); see also *Madera v. State*, 318 Ga. 593, 595 n.2 (899 SE2d 132) (2024) (noting our unease with the practice of importing a *Jackson* analysis into an appellate review of the general grounds); *Priester v. State*, 317 Ga. 477, 484 n.13 (893 SE2d 751) (2023) (same); *Johnson v. State*, 316 Ga. 672, 682 n.4 (889 SE2d 914) (2023) (same). However, like in *King*, we need not determine the correctness of that practice today because the evidence against White was constitutionally sufficient to affirm her conviction as to the malice murder count; the felony murder count was vacated by operation of law; and the aggravated battery count merged into the malice murder count.

contending that the photographs were relevant to upcoming testimony. On voir dire, an investigator in the medical examiner's office conceded that the photographs did not "identif[y] the cause of death of Tyrael McFall." White's counsel then objected, contending that that the photographs were "unnecessary and prejudicial." The State responded that the medical examiner would use the photographs in her testimony to explain her investigation into Tyrael's cause of death (and she later did). The trial court admitted the photographs over White's objection. In its later order denying White's motion for new trial, the trial court explained that the photographs "were relevant to the issue of [Tyrael's] cause of death" under OCGA § 24-4-401 because they "had the tendency to make the existence of the fact that Tyrael died of codeine poisoning, and not from some other injury or abuse, such as smothering, more probable," and that it had "weighed the probative value of the five photos and . . . determined that their value was not substantially outweighed by the danger of unfair prejudice" because "the photos were not gruesome or of the nature to inflame the jury." On appeal,

18

White contends that the photographs were not relevant under Rule 401 because they did not prove the cause of Tyrael's death by "poisoning and not physical injury," and that their probative value, if any, was substantially outweighed by the danger of unfair prejudice under Rule 403 because they were "graphic" and "shed no light on the *internal* cause of death." (emphasis in original)

"[W]e generally evaluate the admissibility of autopsy photographs under OCGA §§ 24-4-401, 24-4-402, and 24-4-403." *Mitchell v. State*, 307 Ga. 855, 863 (838 SE2d 847) (2020) (citation and punctuation omitted).[9]  Important here, "[a]utopsy photographs may be relevant and probative to show the nature and location of a victim's injuries, even if the cause of death is not disputed." *Allen v.*

---

[9] Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 402 provides that "[a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules, as prescribed pursuant to constitutional or statutory authority, applicable in the court in which the matter is pending.  Evidence which is not relevant shall not be admissible."  And under Rule 403, "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

19

*State*, 307 Ga. 707, 710 (838 SE2d 301) (2020). "We review a trial court's evidentiary rulings under an abuse of discretion standard of review." *Williams v. State*, 302 Ga. 474, 478 (807 SE2d 350) (2017) (punctuation and citation omitted).

Here, the trial court did not abuse its discretion in concluding that the autopsy photographs were relevant under Rule 401. At trial, White contested Tyrael's cause of death by arguing that other trauma Tyrael experienced—such as the "traumatic brain injury" his father inflicted on him, and not codeine poisoning—caused his death. The record shows that the State addressed White's argument in part with testimony from the medical examiner, who used the autopsy photographs to explain that her investigation into Tyrael's cause of death included determining if trauma that could be observed on an external examination contributed to his death. And the medical examiner concluded that the minor external injuries she identified as part of the autopsy—and which she was able to point out to the jury in the photographs—did not contribute to Tyrael's death. Because the photographs helped the medical examiner

explain her investigation into Tyrael's cause of death, they made "the existence" of external injuries as the cause of Tyrael's death "less probable than it would be without the evidence." See *Johnson*, 316 Ga. at 683 (holding that the trial court did not abuse its discretion in admitting five autopsy photographs because they "assisted the medical examiner in describing the nature and severity of [the victim's] injuries" and "were highly relevant to the issues of both how and when the injuries were sustained").

Additionally, White has not established that the trial court abused its discretion in concluding that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice under Rule 403. White complains that the photographs were unfairly prejudicial because they were "graphic." But the photographs were neither especially graphic nor gruesome; they did not depict autopsy incisions, and the medical examiner explained that the photographs illustrated only minor external trauma. See *Pike v. State*, 302 Ga. 795, 799 (809 SE2d 756) (2018) (explaining that the challenged autopsy photographs were

21

admissible under Rule 403 because they did "not depict the victim's autopsy incisions, and they [were] not especially gory or gruesome in the context of autopsy photographs in a murder case" and that "they were relevant to show the nature and location of the victim's injuries, which corroborated the State's evidence of the circumstances of the killing"). And the probative value of the photographs was high because they helped the medical examiner explain how she ruled out other possible causes of death—such as trauma—instead of codeine poisoning. Therefore, the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice, if any. See also *Johnson*, 316 Ga. at 683 ("And although the [autopsy] photographs may have been graphic, we cannot say the trial court abused its discretion in concluding that their probative value was not substantially outweighed by the danger of unfair prejudice."). We therefore cannot say that the trial court abused its discretion in admitting the autopsy photographs under Rule 403.

4. White also claims that the trial court abused its discretion

by denying her motion to sever Counts 5 and 7 through 16 from the other charges in the indictment. Prior to trial, White moved to sever Counts 5, 7, and 8 (identity fraud), Counts 9 through 14 (financial-transaction card fraud), Count 15 (second-degree forgery), and Count 16 (RICO) (collectively, the "financial counts"), from the remaining counts (the "murder counts"). At a pre-trial hearing, White contended that the strong evidence supporting the financial counts—which White's trial counsel characterized as "all these bad things about Ms. White"—would unfairly prejudice her with respect to the murder counts. The State responded that each of the financial counts at issue and listed above was intrinsic to the RICO charge in Count 16 and to the murder counts because they provided a "basis for the defendant's motive." Without making specific findings, the trial court denied White's motion from the bench.

"[A] defendant has a right to severance where the offenses are joined solely on the ground that they are of the same or similar character because of the great risk of prejudice from a joint disposition of unrelated charges." *Carson v. State*, 308 Ga. 761, 764-

23

765 (843 SE2d 421) (2020) (citation and punctuation omitted). "However, where the joinder is based upon the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, severance lies within the sound discretion of the trial judge since the facts in each case are likely to be unique." *Price v. State*, 316 Ga. 400, 404 (888 SE2d 469) (2023) (citation and punctuation omitted). "[M]ultiple offenses are not joined together 'solely because they are the same or similar character' if evidence of one offense would be admissible at a separate trial for the other." *McCullum v. State*, __ Ga. __, __ (899 SE2d 171, 184) (2024) (citation omitted). "Typically, a trial court does not abuse its discretion in denying a motion to sever where evidence of one charge would be admissible in the trial of the other and there is no evidence that the joinder confused or misled the jury." Id (citation omitted).

(a) *No Severance as of Right For Counts 5, 7 Through 14, and 16*

To begin, White has not established that she had "an 'absolute right' to sever" Counts 5, 7 through 14, and 16 from Counts 1

24

through 4 and 6 because she has not shown that those "charges [were] joined solely because they [were] of the same or similar character." *McCullum,* __ Ga. at __ (899 SE2d at 184) (citation omitted). As the State noted at the pre-trial hearing on White's motion to sever, it expected the evidence supporting the financial counts to demonstrate White's motive for murdering Tyrael. At trial, to prove the allegations in Count 5, 7 through 14, and 16, the State introduced documentary evidence obtained from White's computer, email accounts, and credit card statements showing that several credit cards were activated using Tyrael's identifying information and that those credit cards were used to conduct transactions and acquire property. The State showed that each of these crimes was completed in a 10-month period before and after Tyrael's death and using the identity of her minor child. The State argued that this evidence demonstrated that greed was a motivating factor in White murdering Tyrael. Because the evidence of Counts 5, 7 through 14, and 16 supported the State's theory of motive—and were not joined "solely because they are of the same or similar

25

character"—White has not shown that she had an absolute right to sever. See *Doleman v. State*, 304 Ga. 740, 744-745 (822 SE2d 223) (2018) (explaining that "a defendant is not entitled to severance where a series of similar crimes 'constituted parts of a single scheme or plan,' even though acts occurred over a period of more than two weeks") (citation and punctuation omitted).

(b) *The Trial Court Did Not Abuse Its Discretion in Declining to Sever Counts 5, 7 Through 14, and 16*

(i) Having concluded that severance of Counts 5, 7 through 14, and 16 was not mandatory, we must evaluate whether the trial court nonetheless abused its discretion by denying White's motion to sever. To begin, White has not pointed to any evidence, and we see none, that the joinder of Counts 5, 7 through 14, and 16 "confused or misled the jury." *McCullum*, __ Ga. at __ (899 SE2d at 184). To the contrary, the verdicts show that the jury "understood the law and the evidence" specific to this case; for example, it reached the nuanced conclusion that two of the overt acts enumerated in Count 16 (RICO) did not constitute a pattern of

26

racketeering activity under OCGA § 16-14-3. See, e.g., *Carson*, 308 Ga. at 765 ("There is no evidence in this case that the combined trial of the charges confused or misled the jury, and the verdict itself, including [the defendant's] acquittal for [battery], shows that the jury fully understood the law and evidence.").

As to whether evidence related to Counts 5, 7 through 14, and 16 would have been admissible in the trial of Counts 1 through 4 and 6, we cannot say that the trial court abused its discretion in concluding that the evidence was relevant, because the evidence lent support to the State's theory that at least part of White's motive to murder Tyrael was to financially exploit him. See OCGA § 24-4-401. To prove the allegations in Counts 5, 7 through 14, and 16, the State introduced documentary evidence obtained from White's computer, email accounts, and credit card statements showing several credit cards were activated using Tyrael's identifying information and that those credit cards were used to conduct transactions and acquire property. The State argued that each of these crimes was connected to the murder because almost all of them were completed in a 10-

27

month period before and after Tyrael's death.[10]  And the State showed that White used Tyrael's identity to perpetrate each of these crimes, thus enhancing the probative value of those crimes to the prosecution of Tyrael's murder.  The State also introduced evidence that White omitted material information regarding Tyrael's medical condition on a life insurance application for a policy insuring Tyrael's life; collected Tyrael's Social Security benefit after he died, even though the benefit terminated upon Tyrael's death; misrepresented her salary in an application to an entity that administers financial grants to crime victims and their caregivers, claiming that Tyrael was such a victim; and falsely represented her total monthly income in a grant application to the Brain and Spinal Injury Trust Fund Commission, seeking funds to pay for Tyrael's transportation.  In addition, the State introduced evidence at trial that White had stated that Tyrael "needed around-the-clock care" and "was a burden" to her, including because Tyrael's physical

---

[10] We note that some of the overt acts alleged in Count 16 (RICO) were not committed within this 10-month window.

condition "limited . . . what job locations [she could] go to"; this allowed the jury to infer that White perceived her financial position to be negatively affected by Tyrael's ongoing medical needs. The State argued that the foregoing evidence demonstrated that greed was an important aspect of White's motivation to murder Tyrael. And this evidence made the State's financial motive argument "more probable . . . than it would [have been] without the evidence." See OCGA § 24-4-401. The trial court therefore did not abuse its discretion in concluding that the evidence was relevant and probative. See id. See also, e.g., *Jordan v. State*, 313 Ga. 841, 845 (874 SE2d 67) (2022) ("Though motive is not an essential element of any offense, evidence of motive is generally relevant in murder prosecutions.").

As to whether the danger of unfair prejudice substantially outweighed the probative value of the evidence for Counts 5, 7 through 14, and 16 in a trial on Counts 1 through 4 and 6, see OCGA § 24-4-403, the trial court's implicit conclusion that the danger of unfair prejudice did not substantially outweigh the probative value

29

of the evidence was not an abuse of discretion. Indeed, "the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly." *Olds v. State*, 299 Ga. 65, 70 (786 SE2d 633) (2016). As we noted above, the evidence the State offered in support of Counts 5, 7 through 14, and 16 was relevant and probative of the State's financial-motive theory. And although we cannot say that the probative value was extremely high,[11] it was nonetheless probative: the State used the evidence from those counts to argue that White exploited Tyrael for financial gain in life,

---

[11] Specifically, the State's financial-motive theory appears to have suffered from a notable weakness: the State did not logically explain why Tyrael's murder was necessary to continue White's alleged fraud—especially considering that White was alleged to have committed extensive fraud against Tyrael and others *before* Tyrael's death, and that Tyrael's death terminated at least some sources of financial support such as Social Security benefits. In other words, it appears that the State did not explain how Tyrael *prevented* White from continuing the pattern of fraud that she allegedly engaged in long before Tyrael's death—reasoning that would have been important to properly establish motive for his murder. See *Harris v. State*, 314 Ga. 238, 271-272 (875 SE2d 659) (2022) (examining the logical chain of reasoning of the State's motive theory in determining the probative value of other acts offered to prove the appellant's motive). But even if the State did not show how all of the financial crimes were directly connected to or dependent on Tyrael's death, the financial crimes all showed that (at a minimum) White was strongly motivated by money and was willing to exploit her son for financial gain. And that, in turn, could support the State's narrative that White killed Tyrael for money, too.

and then used his death to acquire even more money (such as life insurance proceeds), to obtain access to additional funds (through additional credit cards White fraudulently opened or attempted to open), and to more generally shed what at least one witness testified that White had characterized as the "burden" associated with caring for Tyrael.[12] And the State had a real need to establish White's motive, because White put motive at issue by denying that she killed Tyrael (even by mistake), and the evidence in the case involved a significant amount of circumstantial evidence. See *Harris v. State*, 314 Ga. 238, 272 (875 SE2d 659) (2022); see also *Armstrong v. State*, 310 Ga. 598, 603 (852 SE2d 824) (2020) (explaining that "the prosecutorial need for the other acts evidence showing gang membership was high" because, without it, it is unclear what motive [appellant] would have had to shoot [victim] in a crowded park").

As to the "danger of unfair prejudice" and the "needless presentation of cumulative evidence," see OCGA § 24-4-403, we

---

[12] From this latter point, the jury would have been authorized to infer that any purported "burden" in caring for Tyrael would have included a financial burden, including for ongoing medical expenses.

31

acknowledge that the cumulative force of evidence supporting ten counts of financial crimes, including one count that lists dozens of overt acts, could have resulted in prejudice to White insofar as it depicted her as an unscrupulous person who repeatedly exploited the people around her—including her disabled son. And there is at least some chance that given the quantity and nature of these counts and the overt acts alleged in Count 16, the jury could have drawn the improper inference that if White committed financial crimes against her son, she also must have murdered him—which could pose a real possibility of unfair prejudice. See, e.g., *Harris*, 314 Ga. at 263 ("Rule 403's term 'unfair prejudice' speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on an improper basis rather than on proof specific to the offense charged.") (citation omitted).

But that does not seem likely, given the unique facts and circumstances of this case. Indeed, the potential risk of unfair prejudice did not "substantially outweigh[]" the probative value of the relevant evidence presented at trial. That is especially true given

that the nature of the crimes alleged in Counts 5, 7 through 14, and 16 were financial offenses—as opposed to (for example) violent crimes that may have posed more of a concern for suggesting improper propensity to murder—and given the evidence presented about the sequence of events the night Tyrael died that pointed to White's participation in Tyrael's murder at least as a party to the crime. In particular, in addition to other circumstantial evidence of White's involvement in Tyrael's death noted above, Sierra's testimony that she saw Schullerman administer Tyrael's medicine at approximately 7:30 p.m. and evidence that White called 911 at 10:44 p.m.—approximately 3 hours later—aligns with the pharmacokinetics expert's testimony that the codeine's peak toxic effect would have been between 1.5 and 4 hours after ingestion. That, in turn, would have allowed the jury to infer that Schullerman, White, or both, intentionally administered a fatal dose of Tylenol 3 or 4 to Tyrael, left Tyrael with Sierra during a planned outing that evidence later suggested was a ruse, called Sierra a number of times to check on Tyrael's status, and then returned home well after

33

Tyrael ingested the codeine but seemingly before his death. And the jury also heard evidence from which it could have inferred that White was not truthful during interviews with Detective Payne regarding her own alleged illness that led to her being prescribed Tylenol 3, which contained codeine, in the days before Tyrael's death.

(ii) We acknowledge that at first glance, certain aspects of this case may make it appear similar to *Harris v. State*, 314 Ga. 238 (875 SE2d 659) (2022), in which this Court reversed a defendant's conviction for murdering his son based on the trial court's failure to sever certain sex crimes and the State's introduction of extensive, improper "evidence of [the defendant's] sexual activities," where the State argued that the evidence was admissible to show the defendant's motive and intent (among other things). See *Harris*, 314 Ga. at 282-283 (explaining that "[e]xtensive evidence that Appellant was a man who commits sex crimes against minors – admitted without any limitation – likely had a substantial "smear" effect that forced Appellant to proceed at an unfair disadvantage when trying

34

to defend himself against" a prosecution for the murder of his minor son, which we characterized as being "of an entirely different character"). But a closer examination of that case reveals a number of material differences.

To begin, much of the evidence at issue in *Harris* was of a more graphic and inflammatory nature than the evidence supporting the financial crimes charged here. In particular, significant amounts of evidence at issue in *Harris* included (among other things) vulgar sexual messages the defendant sent to minors; lurid photographs of the defendant's sex organ that he sent to various women; and evidence that the defendant had hired prostitutes. Id. at 272-280. In conducting a Rule 403 balancing as to each of these categories of evidence, we described the probative value as "trivial," "minimally probative," and "essentially non-existent," and characterized the unfair prejudice flowing from that evidence as "extremely high," "quite high," and "substantially greater" than the probative value, such that the evidence should have been excluded under Rule 403. See id. In this case, by contrast, the financial-crimes evidence at

issue is more closely related to the murder counts than the sexual misconduct evidence was related to the murder counts in *Harris*, and was therefore more probative. And, importantly, the evidence of financial crimes presented in this case was less provocative, and therefore less likely to inflame the jury, than the evidence at issue in *Harris*, which we concluded "was not relatively benign or merely cumulative." Compare, e.g., *Harris,* 314 Ga. at 272-280, 284 (cleaned up).

We also note that the harm posed by the erroneously-admitted evidence in *Harris* was clearer than the harm White claims here. That is so in part because of the inflammatory nature of much of the evidence at issue in *Harris*, and also because the "determination of [the defendant's] intent was a close question," which meant that the "high risk of prejudice from [] improperly admitted evidence might be offset only by the most compelling properly admitted evidence of guilt," see id. at 284-285—but there, the evidence of intent presented at trial was largely circumstantial and was also conflicting. See id.; see also id. at 288-289 ("When the State's properly admitted

36

evidence is not viewed only positively but rather is balanced against the evidence elicited by Appellant, the proof of Appellant's guilt was not 'overwhelming,' 'compelling, or even strong.'"). Here, by contrast, the State introduced more direct evidence of White's intent, such as Judy Johnson's testimony of White's past statements to the effect that White "shouldn't have had to put up with something [Tyrael's] dad did to him" and that Tyrael was a "burden" to her.

Accordingly, we cannot say that the trial court would have abused its discretion under Rule 403 in admitting the evidence of Counts 5, 7 through 14, and 16 in a trial on Counts 1 through 4 and 6. And given that conclusion, we cannot say that the trial court abused its discretion in denying White's motion to sever. See, e.g., *McCullum*, __ Ga. at __ (899 SE2d at 185) (holding that the trial court did not abuse its discretion in denying a motion to sever a count for the rape of one person from four other counts regarding the rape and murder of another person).

(c) *It Is Highly Probable That the Trial Court's Assumed Error in Failing to Sever Count 15 Did Not Contribute To the Verdicts*

White also contends that the trial court abused its discretion in declining to sever Count 15, which alleged that White and Schullerman committed second-degree forgery in 2015 by fabricating a prescription from a psychiatrist for Xanax, from the murder counts. But even assuming (without deciding) that the trial court abused its discretion in denying White's motion to sever Count 15 from the murder counts, any such error was harmless because it is highly probable that the error did not contribute to the verdicts. Cf. *Howell v. State*, 307 Ga. 865, 875 (838 SE2d 839) (2020) (standard of appellate review for nonconstitutional harmless error). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." *Jackson v. State*, 306 Ga. 69, 80 (829 SE2d 142) (2019) (citation and punctuation omitted).

At trial, the State contended that White's conduct in helping Schullerman procure a forged Xanax prescription in 2015 tended to

show White's use of illicit substances. But other evidence was presented from which the jury could have inferred that White used illicit substances, like cocaine, such that the evidence supporting Count 15 was to some extent cumulative of that other properly-admitted evidence. And even if the evidence related to Count 15 had been excluded, the jury still would have heard evidence of White's financial motive to murder Tyrael—even apart from any alleged use of illicit substances: the alleged identity fraud and financial-transaction card fraud in Counts 5, 7 through 14, and 16, among other acts of fraud that White previously committed. As a result, the jury was aware—even without Count 15—that White committed other acts of fraud and that she may have used illicit substances. Under these circumstances, it is highly probable that the trial court's assumed error in declining to sever Count 15 did not contribute to the verdicts. See, e.g., *Kirby v. State*, 304 Ga. 472, 481 (819 SE2d 468) (2018) ("[T]he jury was already aware that [Appellant] had committed other violent crimes. And any prejudice from the evidence that he had committed two other sets of violent

39

crimes rather than one other set was easily offset by the other compelling evidence against Appellant[.]"); *Hood v. State*, 299 Ga. 95, 105-106 (786 SE2d 648) (2016) (explaining that erroneous admission of defendant's drug-dealing was harmless in part due to properly admitted evidence that defendant dealt similar drugs under other circumstances).

5. White claims that the trial court erred by denying her "Motion to Quash – General and Special Demurrers" regarding Count 16 of the indictment. As discussed above, the State alleged in Count 16 that White and Schullerman violated the Racketeer Influenced and Corrupt Organizations Act, OCGA § 16-14-4 (c), by engaging in a scheme that involved murdering Tyrael to obtain money and property. Before trial, White generally and specially demurred as to Count 16, and the trial court denied both. At trial, the jury found that White was guilty of Count 16, noting on the verdict form that White's conduct for all but 2 of the 37 overt acts constituted a pattern of racketeering activity under OCGA § 16-14-3 (4) (A).

(a) *General Demurrer.* White contends that the trial court erred in denying her general demurrer because Count 16 failed to allege the elements of the offense and to "state the offense in the terms and language of [OCGA § 17-7-54] or so plainly that the nature of the offense charged may be easily understood by the jury." OCGA § 17-7-54. The trial court did not err in concluding that Count 16 of the indictment was sufficient to withstand White's general demurrer.

"A general demurrer challenges the sufficiency of the substance of the indictment." *Green v. State*, 292 Ga. 451, 451 (738 SE2d 582) (2013) (citation and quotation omitted). Consequently, "[o]ur review of the trial court's ruling does not turn on whether the indictment could have been made clearer or more definite, but most importantly whether it 'contains the elements of the offense charged.'" *State v. Mondor*, 306 Ga. 338, 341 (830 SE2d 206) (2019) (citation omitted). But if an indictment "'fails to allege all the essential elements of the crime or crimes charged,' including the required mens rea, it violates due process, is void, and cannot

41

withstand a general demurrer." *Mondor*, 306 Ga. at 341 (quoting

*Jackson v. State*, 301 Ga. 137, 139-140 (800 SE2d 356) (2017)).

"Indeed, we have before explained that [t]he true test of the

sufficiency of an indictment to withstand a general demurrer is [i]f

all the facts which the indictment charges can be admitted, and still

the accused be innocent, the indictment is bad; but if, taking the

facts alleged as premises, the guilt of the accused follows as a legal

conclusion, the indictment is good." *Mondor*, 306 Ga. at 341 (citation

and punctuation omitted). We review a trial court's ruling on a

general demurrer de novo. See *Budhani v. State*, 306 Ga. 315, 319

(830 SE2d 195) (2019).

Here, Count 16 charged White with violating OCGA § 16-14-4

(c). The relevant subsections of OCGA § 16-14-4 provide:

(a) It shall be unlawful for any person, through a pattern
of racketeering activity[13] or proceeds derived therefrom,

---

[13] OCGA § 16-14-3 (4) defines "pattern of racketeering activity" as:
(A) Engaging in at least two acts of racketeering activity in
furtherance of one or more incidents, schemes, or transactions that
have the same or similar intents, results, accomplices, victims, or
methods of commission or otherwise are interrelated by
distinguishing characteristics and are not isolated incidents,

42

to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

(c) It shall be unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section. A person violates this subsection when:

> (1) He or she together with one or more persons conspires to violate any of the provisions of subsection (a) or (b) of this Code section and any one or more of such persons commits any overt act to effect the object of the conspiracy; or

> (2) He or she endeavors to violate any of the provisions of subsection (a) or (b) of this Code section and commits any overt act to effect the object of the endeavor.

---

provided at least one of such acts occurred after July 1, 1980, and that the last of such acts occurred within four years, excluding any periods of imprisonment, after the commission of a prior act of racketeering activity; or
(B) Engaging in any one or more acts of domestic terrorism as described in paragraph (2) of Code Section 16-11-220 or any criminal attempt, criminal solicitation, or criminal conspiracy related thereto.
"'Racketeering activity' means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under the laws of this state involving[:]" "[f]orgery in any degree in violation of Code Section 16-9-1;" "[i]llegal use of financial transaction cards in violation of Code Sections 16-9-31, 16-9-32, 16-9-33, and 16-9-34;" or "[i]dentity fraud in violation of Article 8 of Chapter 9 of this title[,]" among 40 other offenses. OCGA § 16-14-3 (5) (xvi), (xvii), and (xx).

OCGA § 16-14-4 (a), (c). Count 16 alleged that White and Schullerman "did unlawfully conspire to acquire . . . control of money and personal property through a pattern of racketeering as described in Part I-III [of the indictment] . . . and did commit at least one overt act in furtherance of said conspiracy." See OCGA § 16-14-4 (a), (c). The State characterized Part I as a "scheme summary" that explained how White and Schullerman "conspired and endeavored in a scheme" "to support their lifestyle, their drug habit, and to obtain a life free of the care of a disabled child," and linked the alleged scheme to several alleged overt acts. Part II of the indictment alleged that White and Schullerman committed identity fraud against Tyrael, committed financial-transaction card fraud, and murdered Tyrael, and Part III of the indictment alleged that they did so in furtherance of the scheme alleged in Part I. See OCGA § 16-14-3 (5) (A) (xx) (providing that "racketeering activity" includes identity fraud); OCGA § 16-14-3 (5) (A) (xvii) (providing that "racketeering activity" includes "illegal use of financial transaction cards in violation of" OCGA § 16-9-33); OCGA § 16-14-3

44

(5) (A) (iv) (providing that "racketeering activity" includes malice murder). See also OCGA § 16-14-4 (c) (1). And Part III ties Parts I and II together by alleging that:

> [t]he overt acts in concert with the scheme . . . constitute a conspiracy to engage in a pattern of racketeering activity in that they were committed in furtherance of one or more . . . schemes or transactions that had the same or similar intents, results, accomplices, victims or methods of commission or otherwise were interrelated by distinguishing characteristics.

See OCGA § 16-14-3 (4) (A). In sum, Count 16 alleged that White and Schullerman committed 37 overt acts, including financial-transaction card fraud, identity fraud, and the murder of Tyrael, to further their scheme of "obtain[ing] money and property" with the object of "support[ing] their lifestyle, their drug habit, and . . . obtain[ing] a life free of the care of a disabled child." Because White "cannot admit to the allegations" in Count 16 and "be innocent of the crime[] for which [s]he was charged," the trial court did not err in denying White's general demurrer.[14] *Budhani*, 306 Ga. at 321

---

[14] Indeed, if White admitted to committing, with Schullerman, any two or more of the overt acts alleged to further a scheme of "obtain[ing] money and

(affirming the denial of a general demurrer because the defendant could not "admit to the allegations in the indictment and be innocent of the crimes for which he was charged").

(b) *Special Demurrer.* White also contends that the trial court erred in denying her special demurrer. A special demurrer "challenges the sufficiency of the form of the indictment." *Kimbrough v. State*, 300 Ga. 878, 880 (799 SE2d 229) (2017) (citation and punctuation omitted). "By filing a special demurrer, the accused claims not that the charge in an indictment is fatally defective and incapable of supporting a conviction (as would be asserted by general demurrer), but rather that the charge is imperfect as to form or that the accused is entitled to more information." Id. (citation and punctuation omitted). "[A]n indictment comports with constitutional due process and is sufficient to withstand a special demurrer if it contains the elements of the offense charged, sufficiently informs the defendant of what he must be prepared to

property" with the object of "support[ing] their lifestyle, their drug habit, and . . . obtain[ing] a life free of the care of a disabled child"—the allegations contained in Count 16—she would be guilty of violating OCGA § 16-14-4 (c).

defend against, and in the event of another prosecution for the same offense, enables the defendant to determine accurately whether he may plead a former conviction or acquittal." *Smith v. State*, 303 Ga. 643, 647 (814 SE2d 411) (2018). "We review a ruling on a special demurrer de novo to determine the legal sufficiency of the allegations in the indictment." *Hinkson v. State*, 310 Ga. 388, 392 (850 SE2d 41) (2020) (citation and punctuation omitted).

White contends that Count 16 should have been quashed based on a special demurrer because Part III of Count 16 did not allege (1) whether the alleged RICO activity was committed in furtherance of an incident, scheme, or transaction; and (2) of which alleged factual incident, scheme, or transaction the alleged racketeering activity is alleged to be in furtherance. See OCGA § 16-14-3 (4). However, the text of Count 16 belies White's arguments because Part I of that Count—titled "Scheme Summary"—begins by alleging that White and Schullerman "conspired and endeavored in a scheme to obtain money and property." It then goes on to describe, in detail, the conduct that furthered the alleged scheme, including White and

47

Schullerman's procurement of "Tylenol with codeine" to murder Tyrael and use of Tyrael's identity to activate "lines of credit" to pay for "food, travel, pay pal services, electronics, and other household items." And it ends by previewing "Part II – The Overt Acts," alleging that after White and Schullerman murdered Tyrael, they "continued their scheme to get money and property by financially exploiting Tyrael in death . . . as enumerated in the overt acts below." Part II then enumerates and describes the 37 overt acts that the State alleged White and Schullerman committed in furtherance of their criminal scheme. Count 16 thus alleged facts identifying the co-conspirator and the overt acts of racketeering activity that were alleged to "further[]" a "scheme" that "affect[ed] the object of the conspiracy." OCGA §§ 16-14-3 (4) (A), 16-14-4 (c) (1). Compare *Kimbrough*, 300 Ga. at 882 (explaining that an indictment count alleging a violation of OCGA § 16-14-4 could not survive a special demurrer because "the indictment fail[ed] to set forth any facts to show a connection between the enterprise and the racketeering activity, and the nature of that connection [was] not apparent from

48

the identification of the enterprise, the general description of the racketeering activity in [the count], or the subsequent counts charging more particularly the predicate acts of racketeering). Accordingly, White's arguments fail.

(c) *Other Challenges to Count 16 of the Indictment*. White also asserts that Parts I and II of Count 16 contained "improper comments" on her character "in innuendo" that denied her "a fair trial and due process as protected by the Fifth, Sixth and Fourteenth Amendment[s] to the United States Constitution," "Art. I, Sec. I, Paragraphs I and II of the Georgia Constitution," and "OCGA § 24-4-404 as to the character of the accused."[15] White elaborates by contending that the statements at issue "read[] like a closing argument or opening statement and should not have been submitted to the jury" because they were of the nature of "a continuing witness

---

[15] Article I, Section I, Paragraph 1 of the Georgia Constitution of 1983 provides: "No person shall be deprived of life, liberty, or property except by due process of law." Article I, Section I, Paragraph 2 of the Georgia Constitution of 1983 provides: "Protection to person and property is the paramount duty of government and shall be impartial and complete. No person shall be denied the equal protection of the laws."

or continuing argument . . . taken into the jury room." Among others, White points to the following references as "prejudicial": "their lifestyle, drug habit and to obtain a life free of the care of a disabled child;" "meeting co-defendant Schullerman through an online dating service;" "the two residing together;" and "being 'engaged in a scheme to defraud banks and commercial providers . . . through misappropriation of Tyrael's identifying information.'"

At trial, White raised these arguments in a filing titled "Motion to Quash – General and Special Demurrers" and raises them on appeal through that lens. We thus review these arguments about specific allegations contained in Count 16 as part of White's complaint about the denial of her special demurrer.

White has not shown that the trial court erred in denying her special demurrer based on her arguments about "improper comments" on her character. To begin, "an indictment is not evidence," *Cash v. State*, 297 Ga. 859, 863 n.4 (778 SE2d 785) (2015), and the trial court instructed the jury on that point. Moreover, the language of Count 16 accurately described the alleged racketeering

scheme charged by explaining in Part I what the scheme was and then setting forth the 37 alleged overt acts that White and Schullerman allegedly committed to further that scheme. See, e.g., *Malloy v. State*, 293 Ga. 350, 360 (744 SE2d 778) (2013) (holding that an indictment with an "extensive 'background' section" that the appellant contended contained "politically charged, misleading, and prejudicial surplusage likely to diminish the presumption of innocence to which he is entitled and [was] prejudicial and redundant" survived a special demurrer because "the challenged language accurately described the offenses charged and made the charges more easily understood" and that "mere surplusage does not vitiate an otherwise valid indictment"). Accordingly, White has not shown that the trial court erred in denying her special demurrer on these bases.

6. White also contends that trial counsel provided constitutionally ineffective assistance by failing to (a) adequately investigate White's case; (b) request a jury instruction on involuntary manslaughter; (c) object to the virtual testimony of a

witness who testified at trial; (d) subpoena and call Schullerman as a witness; and (e) call a handwriting expert to testify at trial.  For the following reasons, all of White's ineffective assistance of counsel claims fail.

"To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant." *Perkins v. State*, 313 Ga. 885, 901 (873 SE2d 185) (2022) (citing *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984)).  "To satisfy the deficiency prong, a defendant must demonstrate that his attorney 'performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms.'" *Perkins*, 313 Ga. at 901 (citation omitted).  This showing requires a defendant to overcome the "'strong presumption'" that trial counsel's performance was adequate.  Id. (citation omitted).  A defendant attempting to carry his burden must show that "no reasonable lawyer would have done what her lawyer did or would have failed to do what her lawyer

did not." *Lopez v. State*, __ Ga. __, __ (898 SE2d 441, 446) (2024).

"To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Perkins*, 313 Ga. at 901. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Sullivan v. State*, 308 Ga. 508, 510 (842 SE2d 5) (2020) (quoting *Strickland*, 466 U.S. at 694). "This burden is a heavy one." *Young v. State*, 305 Ga. 92, 97 (823 SE2d 774) (2019).

"Ineffectiveness claims involve mixed questions of law and fact, and 'a trial court's factual findings made in the course of deciding an ineffective assistance of counsel claim will be affirmed by the reviewing court unless clearly erroneous,' whereas conclusions of law based on those facts are reviewed de novo." *Sullivan*, 308 Ga. at 510-511 (citation omitted). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Id.* (citation and punctuation omitted).

(a) White contends that trial counsel rendered ineffective assistance on the grounds that he did not interview Schullerman after his guilty-plea hearing and before White's trial, and also did not subpoena and call Schullerman as a witness at trial. White contends that Schullerman may have possessed exculpatory evidence and that trial counsel never interviewed Schullerman to ascertain whether that was so. Trial counsel testified at the motion-for-new-trial hearing that he asked Schullerman's counsel if he could interview Schullerman, but counsel refused the request. Schullerman's counsel also testified at the motion-for-new-trial hearing and explained that her response to White's counsel's request to interview Schullerman was a "hard no." Trial counsel offered ample reasoning at the motion-for-new-trial hearing for declining to call Schullerman as a witness: Schullerman's counsel did not permit trial counsel to interview him before trial, and he therefore could not reasonably estimate what Schullerman's testimony would be; he thought Schullerman—who pled guilty to the financial counts in the indictment—would be an unhelpful witness, with the State using

Schullerman's testimony to emphasize White's participation in the financial crimes; and Schullerman could have contradicted trial counsel's theory, and Sierra's testimony, that Schullerman—and not White—prepared and administered the fatal dose of codeine to Tyrael.

White has not established that trial counsel's failure to interview Schullerman constituted deficient performance. Indeed, we have in other cases concluded that trial counsel did not perform deficiently when he attempted to interview a potential witness and the potential witness refused trial counsel's request. See *Atkinson v. State*, 301 Ga. 518, 527 (801 SE2d 833) (2017) (explaining that the appellant failed to show trial counsel performed deficiently where "trial counsel did in fact attempt to interview [two witnesses], but they refused to speak with her"). And that is what happened here. Trial counsel requested an interview with Schullerman before White's trial, but Schullerman's counsel responded with a "hard no." Under these circumstances, White has not shown that trial counsel's strategic decision for declining to call Schullerman as a witness was

"so unreasonable that no competent attorney would have made [it] under similar circumstances." *McDuffie v. State*, 298 Ga. 112, 116 (779 SE2d 620) (2015) (holding that the appellant failed to demonstrate that trial counsel's "strategic decision not to call" a potential witness was "entirely unreasonable" where trial counsel thought that the potential witness would be "more harmful than helpful") (citation and punctuation omitted).  See also, e.g., *Miller v. State*, 293 Ga. 638, 639-640 (748 SE2d 893) (2013) (concluding that the appellant failed to show that trial counsel performed deficiently where appellant argued that trial counsel failed to "adequately investigate his claim" in part because "counsel tried to interview the State's witnesses, but several of them refused").

(b) White claims that trial counsel was ineffective because he did not request a jury instruction on involuntary manslaughter. There are two types of involuntary manslaughter under Georgia law, and the common element is that the accused "causes the death of another human being without any intention to do so."  OCGA § 16-5-3.

Notably, however, White argued at trial that she "never claimed [Tyrael's death] was a mistake." and at the hearing on White's motion for new trial, her counsel testified that she was "adamant" that she did not mistakenly administer Tylenol with codeine to Tyrael. Trial counsel further explained that he did not request an instruction on involuntary manslaughter because "[w]e [we]re denying that she did this at all. . . . To have a lesser or include[d] [charge] that somehow says that she did it would have to, in my mind at least, for the jury to consider it, there's admission that you did the act, which caused the death of the child." In denying White's motion for new trial, the trial court found "that trial counsel, per his testimony, made a knowing and strategic decision to not request" a charge for involuntary manslaughter because "it did not comport with [White's] defense strategy."

Even assuming, without deciding, that the evidence presented at trial would have authorized an instruction on involuntary manslaughter, "trial counsel's decision not to pursue [it] was not so unreasonable that no competent attorney would have made it under

the circumstances." See, e.g., *Lopez*, __ Ga. at __ (898 SE2d at 447) (assuming without deciding that the evidence authorized an involuntary manslaughter instruction, trial counsel's decision not to pursue that instruction was not deficient performance, because (among other reasons) "[t]rial counsel's decision to pursue an all-or-nothing defense . . . was consistent with [the appellant's] interview statements" and "was not patently unreasonable"). It is well settled that "'[d]ecisions about which defenses to present and which jury charges to request are classic matters of trial strategy, and pursuit of an all-or-nothing defense is generally a permissible strategy.'" *Gardner v. State*, 310 Ga. 515, 519 (852 SE2d 574) (2020) (citation omitted). And the record supports the trial court's finding that counsel believed an involuntary manslaughter instruction would have constituted an "admission that [White] did the act," and therefore would have undermined White's defense that "she did this at all." Moreover, trial counsel's testimony shows that he pursued an "all-or-nothing" defense, and that seeking an involuntary-manslaughter instruction would have been inconsistent with that

defense theory. See, e.g., *Velasco v. State*, 306 Ga. 888, 893 (834 SE2d 21) (2019) (holding that trial counsel did not perform deficiently by failing to request a voluntary manslaughter instruction, because the appellant maintained during consultations with counsel and at trial that he acted in self-defense, a theory that is generally inconsistent with a claim of voluntary manslaughter). Under these circumstances, trial counsel's decision not to request an involuntary manslaughter instruction did not "f[a]ll below a reasonable standard of attorney conduct." *Smith v. State*, 301 Ga. 348, 353-354 (801 SE2d 18) (2017) (rejecting appellant's contention that trial counsel performed deficiently by failing to request an involuntary manslaughter instruction where his "'whole focus' was on a not guilty strategy," explaining that an "'all or nothing' defense is a permissible trial strategy" where trial counsel desires "to avoid admitting even to any negligent, much less reckless, intent").

(c) White contends that trial counsel was ineffective on the basis that he failed to object to a witness's virtual testimony. Prior to trial, the State moved for the trial court to permit Judy Johnson,

59

who previously resided with White at the Cobb County Adult Detention Center prior to White's trial, to testify at trial from Michigan using video-conference technology. At a pretrial hearing, the State asserted that Johnson needed to testify virtually because her physician ordered her not to travel from her home in Detroit because she was pregnant and a cesarean section procedure had already been scheduled for a time that coincided with White's trial. Trial counsel responded that he was "not necessarily opposed to live testimony" via video conference "if that can be accomplished." Trial counsel elaborated that "I would want to make sure—if we do this, there is some direct video as such that she absolutely has to face Ms. White. And Ms. White, of course, has the opportunity to confront her. So to that extent, I'm not opposed to taking testimony by video for health reasons but with some careful guarantees." The State explained that its plan was to have Johnson testify via "direct live feed" from a Michigan courtroom. Trial counsel did not respond further.

At trial, Johnson testified via video-conference technology from

a courthouse in Michigan and White did not object to Johnson's testimony being offered in this way. Johnson testified that she and White previously lived in the same pod at the Cobb County adult detention center, and that during that time, she heard White explain to other inmates that the hospital gave Tyrael a fatal dose of codeine. When some inmates voiced doubts about the plausibility of that story, White began to sob, telling them that "she shouldn't have had to put up with something [Tyrael's] dad did to him and it was a burden to her." Johnson also testified that White said Tyrael "was in the way of her relationship with her boyfriend because she couldn't have a life because he needed around-the-clock care." White's counsel was given the opportunity to cross-examine Johnson and did so.

At the motion-for-new-trial hearing, trial counsel explained that he did not object to Johnson's testimony being provided virtually because, among other things, he did not want "to be the cause of there being any harm to [Johnson's] child based on her coming to testify"; "[he] felt like her testimony was going to be

ridiculous, and she would appear so preposterous that that might be helpful to [White]"; and "[because] [s]he was virtual, [trial counsel thought] maybe she would look even crazier doing something wherever she was."

On appeal, White contends that Johnson's virtual testimony violated White's Sixth Amendment right to confront Johnson, a witness against her, see U.S. Const. Amend. VI, and that trial counsel's failure to object to it constituted deficient performance. But trial counsel's testimony illustrated how his decision not to object to Johnson's virtual testimony was a strategic one. In particular, trial counsel did not object to Johnson's virtual testimony because he did not want to cause harm to Johnson, who was under her physician's orders not to travel from her home in Michigan before the birth of her child, and counsel believed that the location from which Johnson testified was of little import because he anticipated that Johnson's testimony might even be helpful to White. Moreover, trial counsel rigorously cross-examined Johnson, exposing possible inconsistencies in her testimony and questioning

her credibility. Under these circumstances, White has not demonstrated that trial counsel's decision to not object was so unreasonable that "no competent attorney, under similar circumstances, would have made it." *Sullivan v. State*, 301 Ga. 37, 40 (799 SE2d 163) (2017) (explaining that trial counsel was not deficient for failing to object to alleged "testimonial hearsay in violation of [appellant's] Sixth Amendment right to confrontation" because it was a strategic decision) (citation and punctuation omitted).

(d) White contends that trial counsel was ineffective because he failed to hire and call a handwriting expert to testify at trial to cast doubt on the November 3, 2014 signature provided to retrieve White's Tylenol 3 prescription. The State presented evidence that White, Schullerman, and White's mother regularly picked up each other's prescriptions from a local pharmacy. White offered into evidence other signatures that she contended were hers and the signature purporting to be White's on the November 3, 2014 prescription. Based on apparent discrepancies between the sample

signatures White offered into evidence and the signature associated with the Tylenol 3 prescription, White's trial counsel contended in closing argument that Schullerman—and not White—signed for the November 3, 2014 Tylenol 3 prescription. The State then rebutted that claim by presenting evidence that the November 3, 2014 signature was, in fact, White's by pointing to Sierra's earlier identification of the signature as White's.[16] The State also presented evidence that when Detective Payne asked White if she remembered signing for the Tylenol 3 prescription, White said that she both remembered signing for it and that she did not sign for it. In the alternative, the State contended that, even if the signature were Schullerman's, White was aware that Schullerman signed White's name based on evidence indicating that Schullerman called White just two minutes before he would have retrieved the Tylenol 3 prescription from the pharmacy.

At the motion-for-new-trial hearing, White's counsel procured

---

[16] At trial, Sierra denied the signature was White's. However, when cross-examined by the State, she acknowledged that she previously told Detective Payne that the signature *was* White's.

a forensic document-examination expert, who testified that the signature provided to retrieve the Tylenol 3 prescription was "inconsistent" with White's other handwriting samples. However, the expert could not rule out the possibility that it was White's signature.

Pretermitting whether trial counsel performed deficiently by failing to present the testimony of a handwriting expert at trial, White "has not shown that there is a reasonable probability that the expert's testimony would have made a difference in h[er] trial." *Parker v. State*, 305 Ga. 136, 141 (823 SE2d 313) (2019). Even if testimony from the motion-for-new-trial expert had been offered at trial and the jury had credited it, that testimony at best established inconsistency in the signatures; it did not establish that the signature offered to retrieve the Tylenol 3 prescription could *not* be White's. Indeed, the motion-for-new-trial expert could not rule out the possibility that the signature was, in fact, White's. Moreover, the jury heard testimony that Sierra had previously identified the November 3, 2014 signature to be White's and would be left to

65

grapple with the same expert's testimony that he could not rule out the possibility that the signature was White's. And in any event, White has not shown that the expert's testimony would have undercut the State's alternative theory, backed by evidence, that White was engaged in a scheme with Schullerman to sign for and to retrieve the Tylenol 3 prescription under the false pretense of a urinary tract infection. For these reasons, White "has not shown a reasonable probability that the result of [her] trial would have been different had the expert witness testified at trial, [and she] has failed to establish ineffective assistance." *Graves v. State*, 306 Ga. 485, 489 (831 SE2d 747) (2019) (explaining that the appellant failed to establish "[a] reasonable probability, that, but for his lawyer's unprofessional errors, the result of the proceeding would have been different" where a purported expert's testimony at the motion-for-new-trial hearing failed to "rebut[] the substantial evidence of [the appellant's] guilt") (citations omitted). See also *Parker*, 305 Ga. at 141 (holding that the appellant failed to show the requisite prejudice to establish an ineffective assistance of counsel claim where an

expert's testimony at the motion-for-new-trial hearing contradicted the State's claim but where the appellant was unable to establish a reasonable probability that the expert's testimony would have made a difference at trial).

7. In her final enumeration of error, White claims that the State committed a *Brady* violation and that this Court should vacate White's convictions and grant a new trial as a result. See *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LEd2d 215) (1963). For the reasons explained below, White's claim fails.

At trial, Detective Payne testified that Schullerman stated in an interview that he and White each shot approximately 50 rounds of ammunition at the shooting range on the night Tyrael died. Based on that statement, Schullerman and White were indicted for making a false statement (Count 4) to which Schullerman pled guilty before White's trial. Count 4 stated in part:

> [O]n or about the 10th day of November, 2014, [Schullerman and White] did knowingly and willfully make a false statement to Detective Adam Payne . . . to wit: during an interview arising out of the investigation into the death of Tyrael McFall, Michael Schullerman did

67

falsely state that he had fired a handgun at Governor's Gun Club on the evening of November 8, 2014, when asked about his actions that evening.

As support for Count 4, the State presented evidence from the shooting range's owner showing that, although White and Schullerman purchased ammunition and targets the evening that Tyrael died, there was no record that they ever fired guns that evening.

At White's motion-for-new-trial hearing, Schullerman's trial counsel testified that sometime after Schullerman's guilty plea but before White's trial began, the State conducted an interview with Schullerman that Schullerman's lawyer also attended. Schullerman's lawyer testified that Schullerman maintained that he and White shot guns at the shooting range on the night Tyrael died, despite having pled guilty to Count 4. Schullerman's trial counsel further testified that she recalled having a conversation with White's trial counsel after White's trial concluded where Schullerman's trial counsel explained that "what [Schullerman] had said [in this interview] was different than what he pleaded guilty to"

in Count 4. The State did not disclose Schullerman's interview statements to White before or during trial.

When asked whether this information would have affected his decision to call Schullerman as a witness at trial, White's trial counsel stated, "[h]ad I been provided information of what he had given in that interview [with the State], that could have changed my opinion." White's trial counsel also testified that "[h]ad I known [what Schullerman said in the interview] during trial, I might have [called Schullerman as a witness] if for no other reason than to bring out the fact that he told the State something that they intentionally brought evidence to the contrary? I don't know if I would have done that or not. I would have been much more tempted to do that. But I – I didn't do it."

To establish a *Brady* violation, White must show that:

(1) the State, including any part of the prosecution team, possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) a reasonable probability exists that the outcome of the trial would have been different had the evidence been disclosed

69

to the defense. *Anthony v. State*, 302 Ga. 546, 552 (807 SE2d 891) (2017) (citation omitted). "On appeal, we review a trial court's factual findings regarding a *Brady* claim for clear error but review de novo the court's application of the law to the facts." *Downer v. State*, 314 Ga. 617, 633 (878 SE2d 537) (2022). Pretermitting whether the first three requirements are met here, White has failed to establish the fourth: that "a reasonable probability exists that the outcome of the trial would have been different had the evidence been disclosed." Id. (citation and punctuation omitted).

White argues that the State's failure to inform White of Schullerman's statement constitutes a *Brady* violation because the statement was "potentially exculpatory" and the State's failure to disclose it rendered White's trial "fundamentally unfair." But "'[t]he mere possibility that an item of undisclosed information might have helped the defense'" does not satisfy the fourth *Brady* factor. *Upton v. Parks*, 284 Ga. 254, 256 (664 SE2d 196) (2008) (quoting *United States v. Agurs*, 427 U.S. 97, 109-110 (96 SCt 2392, 49 LE2d 342)

(1976)). Rather, White must show "[a] 'reasonable probability' of a different result[, which] is one in which the suppressed evidence undermines confidence in the outcome of the trial." *Turner v. United States*, 582 U.S. 313, 324 (137 SCt 1885, 198 LEd2d 443) (2017) (citation and punctuation omitted). Here, Schullerman's alleged statement would not have contradicted the evidence presented at trial that Schullerman told Detective Payne, on the night Tyrael died, that he and White fired a handgun at the shooting range. The alleged statement also would not undermine testimony from the shooting range's owner that the shooting range had no record of Schullerman and White entering a firing lane on the night Tyrael died. And it would not have undermined evidence that a fatal codeine dose was administered before White and Schullerman left their house to go to the shooting range. At most, Schullerman's alleged statement repeated evidence the jury already heard from Detective Payne: that Schullerman said he and White fired a handgun at the shooting range on the night Tyrael died. See *Burney v. State*, 309 Ga. 273, 284 (845 SE2d 625) (2020) (rejecting *Brady*

71

claim on the prejudice prong where the defendant "offer[ed] no evidence that anything contained in the [alleged *Brady* material] might have differed from the testimony about [that material] or [other evidence] that was presented at trial"); *Mitchell*, 307 Ga. at 862-863 (explaining, on *Brady*'s prejudice prong, that the alleged *Brady* material would have been "unlikely to change the outcome of [the defendant's] trial because the jury had already heard" the alleged *Brady* material); *Lewis v. State*, 304 Ga. 813, 817 (822 SE2d 239) (2018) (rejecting the defendant's *Brady* claim on the prejudice prong where "nothing in the [alleged *Brady* material] call[ed] into question the testimony" of other witnesses). Because White has failed to establish a "reasonable probability" that Schullerman's statement would have "undermined confidence in the outcome of the trial," we conclude that the trial court did not err in denying White's motion for new trial on this basis. *Turner*, 582 U.S. at 324; see also *State v. Thomas*, 311 Ga. 407, 417 (858 SE2d 52) (2021) ("A reasonable probability of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the

72

outcome of the trial.") (citation and punctuation omitted).[17]

*Judgment affirmed. All the Justices concur, except McMillian and LaGrua, JJ., who concur specially in Divisions 4 (a) and (b), and Colvin, J., who concurs in the judgment only in Division 4 (b) (ii).*

---

[17] In our analysis of White's claims, we have assumed one trial counsel deficiency in failing to call a handwriting expert to testify at trial and one trial court error in denying White's motion to sever Count 15, and pretermitted whether the State committed a *Brady* violation by failing to disclose Schullerman's post-plea statement. White has not argued that we should apply a cumulative-error review. Even assuming that the assumed evidentiary error, the assumed deficiency of trial counsel, and the pretermitted *Brady* violation are the sorts of errors that could be assessed cumulatively, we conclude that any such cumulative error did not likely affect the outcome of the trial. See *Haufler v. State*, 315 Ga. 712, 722 n.14 (884 SE2d 310) (2023) (conducting a cumulative-error review even though the appellant did not invite the Court do so and stating that "even assuming that these presumed errors should be considered cumulatively, we conclude that [the appellant] has failed to establish that the combined prejudicial effect of these errors requires a new trial") (citation and punctuation omitted).

PETERSON, Presiding Justice, concurring.

I join the majority opinion in full. I write separately to respond briefly to Justice McMillian's special concurrence. I generally agree with her assessment of Georgia's RICO statute. But I agree with the majority's approach in not relying on that statutory law; over-aggressive use of the RICO statute could pose potential constitutional problems in a case like this one.

Georgia evidence law contains several provisions that, among other things, limit the admission of other crimes in criminal prosecutions. One reason for this is that when a jury is informed that the criminal defendant in front of them did other bad things, jurors (like all human beings) are naturally more inclined to think the defendant did the separate bad thing at issue in the prosecution. We often call this inference "propensity," and label the State's effort to introduce evidence for propensity "improper" and "impermissible." See *Morrell v. State*, 313 Ga. 247, 258 (2) (a) (869 SE2d 447) (2022). And the fact that propensity inferences are natural only increases the risk that they undermine an accused's

74

constitutional right to be presumed innocent until proven guilty. See *Michelson v. United States*, 335 U.S. 469, 475-476 (69 SCt 213, 93 LE 168) (1948) ("[Evidence of the defendant's bad character to establish a probability of his guilt] is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge."); see also *Old Chief v. United States*, 519 U.S. 172, 182 (117 SCt 644, 136 LE2d 574) (1997) ("There is . . . no question that propensity would be an improper basis for conviction[.]" (punctuation omitted)).

Georgia's RICO statute is very broad; it allows the State to bring in evidence of all sorts of other crimes during a RICO prosecution. That's of necessity; the statute was designed to combat "the increasing sophistication of various criminal elements," OCGA § 16-14-2 (a), and the kind of sophisticated conspiracies it was designed to reach are not susceptible to easy categorization. But the State seems increasingly to use that breadth in cases that do not

75

resemble paradigmatic RICO conspiracies; for example, this case involves "racketeering activity" between a girlfriend and boyfriend who bear no resemblance whatsoever to sophisticated criminal enterprises. And the more aggressively the State uses RICO's breadth, the more concern arises about conflict between the RICO statute and the accused's constitutional right to a fair trial. The majority's approach wisely avoids having to grapple with such a challenging and consequential question.

I am authorized to state that Justice Warren joins in this concurrence.

MCMILLIAN, Justice, concurring specially in part.

In Division 4, the Court engages in an extensive analysis as to whether the trial court should have severed what the Court defines as the "murder counts" from the "financial counts," ultimately concluding that the trial court did not abuse its discretion in refusing to sever because evidence of the "financial counts" was relevant and probative to the State's theory that those crimes served as a motive for the murder and that evidence of the "financial counts" was not unduly prejudicial. In conducting this analysis, the Court inexplicably does not recognize that the RICO count, which the Court considers a "financial count," incorporates by reference the malice murder count as well as some of the other "murder counts" as overt acts committed in furtherance of the RICO conspiracy. Because the crimes, as alleged, are intertwined, I conclude that the trial court did not abuse its discretion in refusing to sever and see no need to conduct the analysis engaged in by the Court.

Time and again, we have stated that where offenses are joined in a single indictment and the "joinder is based upon . . . a series of

77

acts connected together or constituting parts of a *single scheme or plan*, severance lies within the sound discretion of the trial judge since the facts in each case are likely to be unique." *Price v. State*, 316 Ga. 400, 404 (2) (888 SE2d 469) (2023) (emphasis supplied; citation and punctuation omitted). See *Rodriguez v. State*, 309 Ga. 542, 547 (2) (847 SE2d 303) (2020); *Carson v. State*, 308 Ga. 761, 764-65 (2) (a) (843 SE2d 421) (2020); *Simmons v. State*, 282 Ga. 183, 185 (4) (646 SE2d 55) (2007).

Here, White moved to sever Counts 1 (malice murder), 2 (felony murder), 3 (aggravated battery), 4 (making a false statement that Schullerman had fired a handgun at the gun club on the evening of the murder) and 6 (making a false statement by denying that White had received a prescription of codeine) from the remaining counts. Count 16 alleged a RICO scheme which was summarized as follows in the indictment:

> In order to support their lifestyle, their drug habit, and to obtain a life free of the care of a disabled child, **Erica Claudette White** ("White"), along with her boyfriend, co-defendant **Michael Robert Schullerman** ("Schullerman"), conspired and endeavored in a scheme

78

to obtain money and property through the overt acts below and by subsequently poisoning Tyrael McFall ("Tyrael") to death through codeine toxicity.

The RICO count then alleged 37 overt acts committed in furtherance of the conspiracy, including malice murder as alleged in Count 1, making a false statement as alleged in Count 4, and making a false statement as alleged in Count 6. The allegations from those counts were explicitly incorporated by reference into the RICO count. Thus, it is clear that some of the counts that White sought to be severed, including the malice murder count, are alleged to be part of a larger RICO conspiracy.

In such a case, we assess whether "in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense." *Price*, 316 Ga. at 404 (2) (citation and punctuation omitted). See *Rodriguez*, 309 Ga. at 547 (2); *Carson*, 308 Ga. at 765 (2) (a). The trier of fact was able to do that here, and White has not pointed to any evidence showing that the jury was misled or confused.

Thus, I conclude that the trial court acted well within its sound discretion in refusing to sever and do not find it necessary to parse whether the "financial counts" also supported White's motive for the murder.[18] See *Rodriguez*, 309 Ga. at 542 n.1, 547-48 (2) (finding no abuse of discretion in trial court's denial of motion to sever defendant's drug trafficking and gang activity counts from counts of murder, because the drug charges were "inextricably bound" to the murder charges, there was no evidence that the combined trial of the charges "confused or misled the jury," and the verdict itself, including acquittal on various counts, showed that the jury "fully understood the law and evidence" (citation and punctuation omitted)); *Carson*, 308 Ga. at 765-66 (2) (a) (finding no abuse of discretion in trial court's refusal to sever charges stemming from course of continuing conduct where no evidence showed that the

---

[18] The Court also expends considerable effort in distinguishing *Harris v. State*, 314 Ga. 238 (875 SE2d 659) (2022). In my view, *Harris* is distinguishable because the State did not allege that Harris engaged in a scheme that included murdering his son *and* committing sexual acts with other women. See id. at 238-39, 258 (1) (m), 261 (3)-283 (4). The other acts that were introduced in that trial were only used to support motive, intent, and the absence of mistake or accident. See id.

combined trial of the charges confused or misled the jury and where

verdict showed that the jury fully understood the law and evidence);

*Overton v. State*, 295 Ga. App. 223, 223-24, 234-35 (3) (671 SE2d

507) (2008) (finding no error in trial court's denial of motion to sever

RICO counts from crimes alleged to be a part of defendants' scheme

of illegal activity, and reasoning that the jury could distinguish the

evidence and apply the law intelligently to each offense).[19]

For these reasons, I concur specially to Division 4 (a) and (b). I

concur fully in the remainder of the opinion.

---

[19] In his concurring opinion, Presiding Justice Peterson explains that "the more aggressively the State uses RICO's breadth, the more concern arises about conflict between the RICO statute and the accused's constitutional right to a fair trial" and that as a result, the "majority's approach wisely avoids having to grapple with such a challenging and consequential question." Conc. Op. at __. However, I note that in Division 5 (c), the Court rejects White's argument that the inclusion of the RICO count in the indictment "denied her a fair trial and due process as protected by the Fifth, Sixth and Fourteenth Amendment[s] to the United States Constitution, Art. I, Sec. I, Paragraphs I and II of the Georgia Constitution, and OCGA § 24-4-404 as to the character of the accused." Maj. Op. at 50-53 (cleaned up). And, White does not argue on appeal that the RICO count should have been severed on the basis that including the count would deprive her of her constitutional right to a fair trial. For these reasons, I do not see how the purported avoidance of such a "challenging and consequential question" justifies the Court's approach on severance.

I am authorized to state that Justice LaGrua joins in this concurrence.

LaGrua, Justice, concurring specially in part.

I join Justice McMillian in concurring specially to Division 4 (a) and (b), and I concur fully in the remainder of the majority opinion. I write separately to caution prosecutors regarding the overuse of RICO. The intent of Georgia's RICO statute is to address "the increasing sophistication of various criminal elements and the increasing extent to which the state and its citizens are harmed as a result of the activities of these elements." OCGA 16-14-2 (a). See also *Chancey v. State*, 256 Ga. 415, 416 (I) (349 SE2d 717) (1986) (noting that Georgia's RICO statute is patterned after the federal RICO statute, which dealt "with the problem of the infiltration of organized crime into all areas of American life through the money derived from its illegal endeavors."). That is not this case. White did not murder her two-year-old son as a part of a sophisticated criminal enterprise. And, just because we hold today that, under these facts, the law supported trying White together for the RICO and the murder charges does not mean that it was a smart use of the law. I remind the State that a prosecutor's "duty is to seek justice, not

merely to convict. . . ." *Carr v. State*, 267 Ga. 701, 711 (10) (482 SE2d 314) (1997) (citations and punctuation omitted). Continuing to overuse the law in this manner by charging RICO where it only technically applies could result in a rewrite of the law.