**FIFTH DIVISION**
**MERCIER, C. J.,**
**MCFADDEN, P. J., and RICKMAN, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**October 30, 2024**

# In the Court of Appeals of Georgia

A24A0960. ROSENBAUM v. THE STATE.

MCFADDEN, Presiding Judge.

Joseph Rosenbaum ("Rosenbaum") was tried with his wife, Jennifer Rosenbaum, for crimes arising from the death of one of their foster children and the abuse of her sister, a second foster child. The jury returned verdicts finding Joseph Rosenbaum guilty of second-degree murder, multiple counts of first- and second-degree cruelty to children, multiple counts of aggravated assault, and one count of aggravated battery. The trial court sentenced Rosenbaum to 50 years, the first 30 years to be served in confinement and the remainder to be served on probation.

After the trial court denied his motion for new trial, Rosenbaum filed this appeal. He argues that the evidence does not support the second-degree murder

conviction because the state failed to prove proximate cause. We hold that the state presented sufficient evidence from which the jury could conclude beyond a reasonable doubt that Rosenbaum's conduct proximately caused the death of the child. We also hold that the state presented sufficient evidence from which the jury could conclude beyond a reasonable doubt that Rosenbaum was at least a party to the other crimes of which he was convicted.

We hold that Rosenbaum waived any conflict of interest that arose from trial counsel's joint representation of both Rosenbaum and Jennifer Rosenbaum. Finally, we hold that Rosenbaum has not shown that trial counsel was ineffective. So we affirm.[1]

1. *The evidence at trial*

"[I]n conducting a review of the constitutional sufficiency of the evidence, we view the evidence in the light most favorable to the verdicts. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979)." *Siders v. State*, ___ Ga. ___, ___

---

[1] Oral argument was held in this case on May 8, 2024, and is archived on the court's website. See Court of Appeals of Georgia, Oral Argument, Case No. A24A0960 (May 8, 2024), available at https://vimeo.com/944693283.

(2) (\_\_ SE2d \_\_) (Case No. S24A0607, decided Oct. 15, 2024). So viewed, the evidence at trial showed as follows.

In April 2015, the mother of L. D. and M. P. lost custody of them because of her use of drugs. At that time, L. D. was one year old and M. P. was three years old.

The children were placed in a foster home on April 17, 2015, and stayed there until June 11 or 12, 2015, when they were moved to a second foster home. They stayed in the second foster home until July 24 or 25, 2015, when the Rosenbaums took custody.

Jennifer Rosenbaum and the children's mother knew each other because they had lived in the same foster home when they were children. At the time that the Rosenbaums got custody of the children, Jennifer Rosenbaum was a third-year law student who worked in the juvenile division of the Henry County District Attorney's office. Jennifer Rosenbaum saw L. D. and M. P. when they were at the juvenile court, recognized them from the mother's social media, and contacted a caseworker with the Department of Family and Children Services ("the department") to inquire about them. Jennifer Rosenbaum was interested in becoming a placement for the children until the mother completed her case plan.

3

Until the placement was finalized, the Rosenbaums had unsupervised, weekend visitation with the children. The children would return to their foster homes from those visits with injuries. Jennifer Rosenbaum would explain that the children had injured themselves while playing.

Because of the ongoing injuries, the second foster parent took the children to the department's office to document the injuries, to report her concerns, and to seek an investigation. The department caseworker assigned to the children discussed the foster parent's concern with Jennifer Rosenbaum, but took no other action. The children's visits with the Rosenbaums continued.

The Rosenbaums took custody of the children on July 24 or 25, 2015, and the children lived with the Rosenbaums until November 17, 2015, the date of L. D.'s death.

While the children were in the care of the first two foster parents, their great-grandmother had weekly visitation with them, but never noticed bruising or other injuries on them. Once the Rosenbaums had custody of the children, the great-grandmother had some visitation and began to notice injuries on the children. On one occasion, she saw that L. D.'s face was bruised. Jennifer Rosenbaum said that L. D.

had fallen down the stairs and landed face first on a toy. Another time, L. D. had a black eye. Jennifer Rosenbaum said that L. D. had fought with another child at daycare. But the children did not attend daycare. A few weeks before Halloween 2015, the great-grandmother attended a birthday party for M. P. The entire side of L. D.'s face was bruised. The bruise was in the shape of a hand. Jennifer Rosenbaum had bruises on her knuckles.

Other people who saw the children also noticed injuries. During a visit with the children at the Rosenbaums' house in early September, the case manager noticed a bruise on L. D.'s wrist. Jennifer Rosenbaum said that L. D. had been injured at daycare. But, as noted, the children did not attend daycare.

Also in September 2015, the assistant district attorney with whom Jennifer Rosenbaum had worked as a law student met her and the children for lunch. M. P. had a bruise around her eye. Jennifer Rosenbaum explained that she had forgotten to secure the gate at the top of the stairs and M. P. had fallen down the stairs.

On October 19, 2015, Jennifer Rosenbaum took L. D., who was two years old by that time, to an urgent care center for what turned out to be a broken leg. Jennifer Rosenbaum explained that L. D. had fallen at gymnastics four days before and had

fallen into a hole in the yard at her great-grandmother's house a couple of days before that. But the department's caseworker saw the children on October 16, 2015, and L. D. had no issue with her leg; the gymnasium at which M. P. took gymnastics had no record of L. D. ever having been injured at the facility; L. D. had not been to her great-grandmother's house in weeks; and the great-grandmother's yard did not have any holes.

The tibia bone in L. D.'s leg was fractured. The fracture was very close to L. D.'s knee, and it was caused by an enormous amount of force, not a simple fall. A child of L. D.'s age usually cannot generate that amount of force. The medical provider at the urgent care center put a splint on L. D.'s leg and instructed Jennifer Rosenbaum to follow up with an orthopedic doctor.

A pediatric orthopedist saw L. D. the next day. He was concerned that the injury was not accidental. Given the nature of the fracture, it was unlikely that L. D. had fractured her leg by stepping in a hole or by falling during a gymnastics class. Jennifer Rosenbaum's delay in seeking treatment for L. D. also concerned him, because delay in seeking medical treatment for a child is a risk factor for child abuse.

The pediatric orthopedist directed Jennifer Rosenbaum to immediately take L. D. to Egleston Children's Hospital, and she replied that she would do so. But Jennifer Rosenbaum did not take L. D. to Egleston that day or the next.

Jennifer Rosenbaum instead took L. D. to another provider at a different medical practice on October 23, 2015, three days after she had been seen by the pediatric orthopedist who had urged her to take L. D. directly to Egleston. Jennifer Rosenbaum told the other provider that L. D. had fallen off a balance beam while her sister had a gymnastics class. She did not mention that L. D. had fallen in her great-grandmother's yard. (Nor did she tell the department's case manager that L. D. had fallen in the yard.) A care giver's inconsistent history of the origin of an injury is a risk factor for child abuse.

That medical provider put a cast on L. D.'s leg, and when he removed the cast on November 13, 2015, he did not see the visible injuries that were present on her leg on November 17, 2015, the day she died.

In the fall of 2015, M. P. took a gymnastics class with one other student. The mother of the other student and Jennifer Rosenbaum would sit together and talk while waiting for the children to finish the class. L. D. was with Jennifer Rosenbaum every

7

time but one. L. D. would lie on a bench during the class. She was unusually calm and quiet for a two year old.

On one occasion, L. D. slid off of the bench to look at a toy, and her shirt came up. The other mother saw extensive bruising on L. D.'s stomach. The other mother gasped, and Jennifer Rosenbaum explained that L. D.'s biological mother had abused her and had burned her by pouring boiling water on her abdomen and private parts. On another occasion, Jennifer Rosenbaum explained to the other student's mother that L. D.'s leg had been bothering her for a couple of days and that L. D. must have hurt her leg when the children were doing gymnastics in the front yard. The other mother asked Jennifer Rosenbaum if she was going to take L. D. for medical treatment. Jennifer Rosenbaum responded that she did not like taking L. D. to the doctor because they asked so many questions.

On November 2, 2015, M. P. had a bruise on her face that was so significant that her gymnastics teacher asked about it. M. P. said that she fell getting out of the bathtub. The mother of the other student in M. P.'s gymnastics class also asked M. P., in front of Jennifer Rosenbaum, how she had injured herself. M. P. looked at

Jennifer Rosenbaum, paused, and then said that she had fallen. Jennifer Rosenbaum told the department's case manager that M. P. was injured when she fell in the tub.

That same day, November 2, the owner of the gym encountered L. D. and Jennifer Rosenbaum in the facility's office while Jennifer Rosenbaum was completing paperwork. The owner saw that L. D., who by that time had the cast on her leg, was crying, and asked what had happened. Jennifer Rosenbaum did not say that L. D.'s injury had occurred at the gym. She simply did not respond to the question.

At 5:41 p.m. on November 17, 2015, Jennifer Rosenbaum called 911, reporting that L. D. was choking. When they arrived, the emergency responders saw Jennifer Rosenbaum attempting cardiopulmonary resuscitation and giving rescue breaths to L. D. Jennifer Rosenbaum said that she had attempted the Heimlich maneuver, that she had beaten L. D. on her back, and that she had used her finger and a butter knife to try to dislodge the obstruction that was causing L. D. to choke.

L. D. had no pulse and was not breathing. Although emergency services were dispatched because of the report of choking, the emergency responders failed to find an obstruction in L. D.'s airway. She was transported to the hospital, where she was pronounced deceased.

L. D. had no food, vomit, or any kind of obstruction in her airway. She did not have the bluish discoloration typical of a choking person. She did not have the hemorrhaging in the eyes that is consistent with choking. During L. D.'s autopsy, nothing was found that would have obstructed her airway.

In an interview with police, Jennifer Rosenbaum described the incident in a manner that suggested a seizure, not an obstruction of L. D.'s airway. She described L. D.'s arms and legs flailing, her head rolling back, and her eyes rolling back.

L. D. was extensively bruised on her chest, her pelvis, her entire back, the sides of her abdomen, her wrist, her arms, her legs, her ear, her face, her chin, her shoulder, her armpit, her hand, her foot, and her scalp. The bruises on L. D.'s back were consistent with blunt-force trauma from being struck with a fist. The bruises occurred at different times; the more recent bruises were on the lower back, while the bruises on the upper back, where resuscitative back blows would have been given, were older.

The bruising on L. D.'s abdomen indicated that she had been struck with a looped object. There was also an area of hypopigmentation on L. D.'s abdomen that indicated that she had been burned.

The bruising on L. D.'s chest was in the shape of a whip. The bruises to her pubic area were caused by significant blunt force and occurred at different times, some as early as two days before L. D.'s death.

The bruises on L. D.'s buttocks were caused by a great deal of force and were inflicted hours before L. D.'s death. Blunt-force trauma caused the bruises to L. D.'s arm and legs. Fifty percent of the skin on the edge of L. D.'s left ear had been removed, and the ear was bruised deep inside. L. D.'s many bruises appeared to be of different ages and were not consistent with a child choking.

L. D. had experienced significant blunt-force trauma to her abdomen, such as from being punched, kicked, or stomped upon. The blunt-force trauma caused internal bleeding and fatal internal injuries, including a laceration of her liver, a laceration of her pancreas, which was severed into two parts, and injuries to the tissues supporting the small and large intestines. Fifteen percent of L. D.'s blood was circulating freely in her abdominal cavity. L. D. experienced this trauma 40 minutes to an hour before she exhibited the seizure-like symptoms that occurred at the time of her death, but she had experienced similar trauma a few days to a week previously and had a healing injury to her liver.

Blunt-force trauma caused significant bleeding in L. D.'s thymus, an organ above the heart in the chest cavity. The extent of the bleeding in the thymus indicated that it was not caused by resuscitative efforts but was consistent with L. D. having been punched in the chest. She also had internal bleeding in the muscles in her neck and bleeding and bruising in her diaphragm.

She had abrasions on her scalp, forehead, nose, lip, and ear. Some of the abrasions on L. D.'s scalp occurred days before her death. She experienced blunt-force trauma to her head. Some of the injuries to the top of L. D.'s head occurred at least two days before her death, while others occurred the day of her death. The extent of the injuries to her head indicated that the trauma was not accidental.

L. D.'s left arm was broken in two places. An x-ray of a healing fracture in her ulna, a bone in the lower arm, indicated that the fracture had occurred two to four weeks before her death. That fracture was a nightstick fracture, which can occur when the injured person is holding up an arm in a defensive posture. An x-ray showed a healing fracture at the end of her humerus, a bone in the upper arm, that appeared to be two to three weeks old. She also had a healing fracture in one of her ribs. That fracture was a few weeks old, and its location indicated that it had been caused by

forceful squeezing. Fractures in that location in a two-year-old child are usually the result of inflicted, not accidental, injury.

L. D.'s injuries were not caused by the administration of cardiopulmonary resuscitation, the Heimlich maneuver, or other resuscitative actions. L. D.'s seizure was caused by the abdominal trauma inflicted forty minutes to an hour before her death, and her cause of death was multiple blunt-impact injuries to her torso.

Although some of L. D.'s injuries appeared to have been from normal play, overall they indicated that L. D. had been physically abused. Medical providers who treated L. D. in the emergency room and the coroner who examined her testified that her abuse was among the worst child abuse they had ever seen.

M. P., who was four years old at the time of L. D.'s death, was examined after L. D. died. X-rays of her left arm showed a two- to three-week-old healing fracture at the end of her humerus, and she complained of pain in her left elbow. M. P. was bruised on her arm, her face, her finger, her neck, her ear, her knees, her ankles, and her hip. She had abrasions on her back and the back of her head.

An expert in the area of child abuse pediatrics testified that the likelihood of a child of M. P.'s age experiencing accidental trauma to the area of her neck where she

was injured is less than 0.2 percent. The bruising on her hip was in a pattern that indicated she had been struck with a belt or a looped cord. The bruise on her arm appeared to have been caused by M. P. being struck by an object.

M. P.'s face, neck, jaw, and ear included areas with petechiae, or broken blood vessels, which occur from high-velocity impact, such as from being quickly struck with something. M. P.'s bruises were in various stages of healing. The photographs of M. P. showed clear signs of physical child abuse.

M. P. was returned to the custody of her second foster parent, who saw that M. P. was covered with bruises. M. P. told the foster parent that appellant Joseph Rosenbaum had caused the bruises by beating her on her back. She explained that Jennifer Rosenbaum would drag her and L. D. up and down the stairs by their arms. She also said that Jennifer Rosenbaum kicked L. D. and kicked or kneed M. P. in the stomach. M. P. explained that Jennifer Rosenbaum had told her that if anybody asked, to say that she fell down. The foster parent took M. P. to her pediatrician, who documented the extensive bruising and concluded that the bruising was the result of physical abuse, although M. P. told the doctor that she had fallen.

After L. D.'s death, M. P. told her great-grandmother that she had been spanked with a belt, that Jennifer Rosenbaum would grab the children by their arms and then twist the arms, and that Jennifer Rosenbaum would knee them in the stomach. She told her first foster mother that both Rosenbaums kneed the children in the stomach and beat them with belts. She also said that Jennifer Rosenbaum had instructed her to say that L. D. injured her leg in gymnastics.

M. P. testified at trial that appellant Rosenbaum was present on occasions when Jennifer Rosenbaum hit the children, but he did or said nothing to stop her.

In the week prior to L. D.'s death, the Rosenbaums were the only people who cared for the children. Although Jennifer Rosenbaum was the primary caretaker of the children, appellant Rosenbaum cared for them while Jennifer Rosenbaum was in class, at her internship, or elsewhere. He bathed the children, dressed L. D., and changed her diaper. He applied medicated pain relief cream to M. P.'s bruised left arm. He was present when Jennifer Rosenbaum hit the children, but he did not intervene. Rosenbaum was at work at the time of L. D.'s death.

2. *Sufficiency of the evidence*

(a) *Counts 8 and 9*

Rosenbaum argues that the state failed to prove that his conduct proximately caused the second-degree murder and second-degree child cruelty charged in Counts 8 and 9 of the indictment. We hold that because the second-degree child cruelty in Count 9 "merged with the second-degree murder count, . . . a challenge to the sufficiency of the evidence supporting [that] cruelty to children conviction is not currently before us." *Melancon v. State*, ___ Ga. ___, ___ n. 8 (3) (___ SE2d ___) (Case No. S23G1128, decided Sept. 17, 2024). See *McCabe v. State*, 319 Ga. 275, 280 n.2 (1) (b) (903 SE2d 78) (2024). But we hold that the evidence was sufficient to support the second-degree murder conviction charged in Count 8.

Count 8 alleged that Rosenbaum

did cause the death of [L. D.], while in the commission of . . . the felony offense of Cruelty to Children in the Second Degree, in that said accused did with criminal negligence cause [L. D.], a child under the age of eighteen (18) years, cruel and excessive physical and mental pain as a result of blunt force trauma to her abdomen, pancreas, liver, and intestine, by leaving the child in the care of Jennifer Rosenbaum after knowing the child had previously been physically abused while in Jennifer Rosenbaum's care. . . .

See OCGA §§ 16-5-1 (d) ("A person commits the offense of murder in the second degree when, in the commission of cruelty to children in the second degree, he or she causes the death of another human being irrespective of malice."); 16-5-70 (c) ("Any person commits the offense of cruelty to children in the second degree when such person with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain.").

Rosenbaum argues that even if he was aware of Jennifer Rosenbaum's physical abuse of L. D., the evidence was insufficient to prove that his conduct was a proximate cause of L. D.'s death because it was not reasonably foreseeable that leaving L. D. with Jennifer Rosenbaum would lead to L. D.'s death.

> [P]roving that a defendant "caused" the death of another human being requires proof of proximate cause. This showing has two components: cause in fact and legal cause. A defendant's conduct is a cause in fact of a death if the defendant's conduct played a substantial part in bringing about or actually causing the death — typically shown through evidence that the death would not have happened "but for" the defendant's conduct — or if the defendant's conduct materially accelerated the death. And a defendant's conduct is a legal cause of a death if the death was reasonably foreseeable — that is, a probable or natural consequence of the criminal conduct according to ordinary and usual experience, not a merely possible result. Determining whether the

17

[s]tate has proved these requirements in any given case is fact-intensive and demands mixed considerations of logic, common sense, justice, policy, and precedent, so questions of causation are generally left to the jury at trial.

*Melancon*, ___ Ga. at ___ (2) (citations and punctuation omitted).

The "showing [of cause in fact] is ordinarily made through evidence from which a jury can infer that the forbidden result would not have happened 'but for' the defendant's conduct." *Melancon*, ___ Ga. at ___ (2) (a). "And . . such a showing will establish cause in fact whether or not the defendant's conduct was the sole or immediate cause of death." Id. at ___ (2) (a) (punctuation omitted).

We hold that applying their logic and common sense, the jurors could have concluded from the evidence that had Rosenbaum not left L. D. in the care of Jennifer Rosenbaum, Jennifer Rosenbaum would not have inflicted the blunt-force trauma to L. D.'s abdomen, pancreas, liver, and intestine that resulted in L. D.'s death. So the evidence was sufficient to prove cause in fact.

Legal cause "takes as a given that the defendant's conduct was causally connected to the forbidden result — in a 'but for' sense or otherwise — and asks whether the death resulted from the defendant's conduct in such an unforeseen or

attenuated way that the defendant cannot be held accountable for the death." *Melancon*, ___ Ga. at ___ (2) (b). We hold that the evidence allowed the jury to conclude that it was reasonably foreseeable that leaving L. D. in the care of Jennifer Rosenbaum would result in the abuse that caused her death.

The evidence showed that L. D. had been the victim of serious child abuse in the period of time leading up to her death, when only the Rosenbaums had cared for her. L. D. was extensively bruised, and some of her bruising occurred in the days before her death. L. D.'s left arm had been broken in two places two to four weeks before her death. One of the fractures was the type of fracture that occurs when the injured person is holding up an arm in a defensive posture, and the fracture visibly deformed her arm.

L. D. had a few-weeks-old fracture in one of her ribs in a location that indicated she had been forcefully squeezed. About a month before her death, L. D. sustained a fractured tibia, and the location of the fracture near her knee indicated that the fracture was caused by the application of an enormous amount of force, not a simple fall. L. D. experienced blunt-force trauma to her head days before her death and blunt-force trauma to her abdomen, causing an injury to her liver, some time in the weeks

19

before her death. The extent of the injuries indicated that the trauma was not accidental.

And there was evidence that Rosenbaum knew of the abuse. He watched the children alone when Jennifer Rosenbaum was at school and elsewhere. He bathed them and changed L. D.'s diaper, so the jury could conclude that he saw L. D.'s extensive bruising. M. P. testified that he was present when Jennifer Rosenbaum hit the children, but did nothing to stop her.

Given the evidence of extensive, serious, non-accidental injuries to L. D. in the days and weeks leading up to her death as well as the evidence supporting the conclusion that Rosenbaum knew of the abuse, we hold that the evidence was sufficient for the jury to conclude that the fatal blunt-force trauma to L. D.'s abdomen, pancreas, liver, and intestine inflicted by Jennifer Rosenbaum was a foreseeable consequence of Rosenbaum's leaving L. D. in Jennifer Rosenbaum's care. So the evidence was sufficient to establish that Rosenbaum's conduct was a legal cause of L. D.'s death.

(b) *Counts 42 and 43*

Counts 42 and 43 charged Rosenbaum with aggravated battery and first-degree child cruelty for fracturing M. P.'s arm and causing her pain. See OCGA §§ 16-5-24 (a) ("A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof."); 16-5-70 (b) ("Any person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain.").

Rosenbaum argues that the state presented no evidence that M. P. fractured her arm. On the contrary, the pediatric orthopedist who had examined L. D.'s broken leg testified that x-rays of M. P.'s arm showed a two- to three-week-old healing fracture at the end of her humerus. And there was testimony that Jennifer Rosenbaum would grab M. P.'s and L. D.'s arms, twist them, and drag M. P. and L. D. up and down the stairs by their arms. The state presented evidence that when she was examined after L. D.'s death, M. P. complained of elbow pain and that Rosenbaum had applied medicated pain relief cream to M. P.'s left arm. This evidence was sufficient to support the convictions of aggravated battery and first-degree child cruelty for

21

fracturing M. P.'s arm. *Earwood v. State*, 326 Ga. App. 794, 797 (1) (755 SE2d 312) (2014).

(c) *Counts 44, 45, 46, and 47*

Counts 44, 45, 46, and 47 concern conduct causing M. P.'s other injuries. They charge aggravated assault and first-degree child cruelty for inflicting blunt-force trauma to M. P.'s head, neck, buttock, hip, and back; and for causing pain from those assaults. See OCGA §§ 16-5-21 (a) (2) ("A person commits the offense of aggravated assault when he or she assaults . . . with any object. . . which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]"); 16-5-70 (b). We hold that the state presented sufficient evidence from which a jury could find Rosenbaum guilty of these counts beyond a reasonable doubt, given M. P.'s outcries that he caused bruises by beating her and that both Rosenbaums kneed the children in the stomach and beat them with belts.

(d) *Counts 48 and 49*

Counts 48 and 49 charged Rosenbaum with second-degree child cruelty for causing L. D. and M. P. pain by failing to seek medical attention for them. See OCGA

§ 16-5-70 (c). He argues that the evidence was insufficient to prove that he knew the children had injuries that needed medical attention.

The evidence showed that after L. D. suffered a leg fracture, the Rosenbaums delayed seeking medical care for her, although L. D. would have been in so much pain that the people around her would have known of the injury. Additional evidence showed that L. D.'s arm was fractured two to four weeks before her death, and the arm was visibly deformed because of the fracture. The Rosenbaums never sought medical care for the fracture. Nor did they seek medical care for M. P.'s fractured arm, although Rosenbaum applied medicated pain relief cream to the arm.

This evidence was sufficient for the jury to find that Rosenbaum committed second-degree child cruelty by failing to obtain medical care for L. D. and M. P. as charged in Counts 48 and 49 of the indictment.

(e) *Remaining counts*

Rosenbaum argues that the evidence does not support his convictions as a party to the crimes alleged in the remaining counts, because the state failed to present any evidence that he aided, abetted, or assisted Jennifer Rosenbaum as an accessory before the fact. The remaining counts are six counts of aggravated assault on L. D. and six

counts of first-degree child cruelty for causing pain from the assaults. See OCGA §§ 16-5-21 (a) (2); 16-5-70 (b). Rosenbaum argues that the convictions are based solely on the allegations that he covered up Jennifer Rosenbaum's abuse of L. D., and that this is, at most, accessory after the fact. See OCGA § 16-10-50.

"Every person concerned in the commission of a crime" — including a person who "[i]ntentionally aids or abets in the commission of the crime" — "is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a), (b) (3). We have held that, "[i]n essence, to be guilty as a party to a crime as an aider or abettor pursuant to OCGA § 16-2-20 (b) (3), a defendant must be an accessory before the fact." *Grant v. State*, 227 Ga. App. 243, 245 (488 SE2d 763) (1997) (citation and punctuation omitted).

However, in order to prove a person is a party to a crime, the state must prove shared criminal intent, and "[w]hether [shared criminal] intent exists is a jury question that may be inferred from a person's presence, companionship, and conduct *before, during, and after the crime.*" *Coley v. State*, 305 Ga. 658, 663 (4) (827 SE2d 241) (2019) (citation and punctuation omitted; emphasis supplied). Moreover, "where the crimes involve relatives with close relationships, slight circumstances can support the

inference that the parties colluded[.]" *Virger v. State*, 305 Ga. 281, 288 (3) (824 SE2d 346) (2019) (citation and punctuation omitted). "Considering the evidence, both direct and circumstantial, in a light most favorable to the verdict, we conclude that a rational trier of fact could have found [Rosenbaum] guilty beyond a reasonable doubt [at least] as a party to the crimes charged." *Joyner v. State*, 280 Ga. 37, 39 (1) (622 SE2d 319) (2005).

Contrary to Rosenbaum's argument on appeal, the evidence does not show that his participation was limited to actions after Jennifer Rosenbaum committed the crimes. The state presented evidence that would allow the jury to find that Rosenbaum committed crimes himself, including M. P.'s statements that both Rosenbaums kneed the children in the stomach and beat them with belts. The state also presented evidence from which the jury could conclude that Rosenbaum actually witnessed Jennifer Rosenbaum assaulting L. D., but failed to intervene to protect her.

Other evidence showed that Rosenbaum had shared criminal intent. A jury could find that Rosenbaum knew of L. D.'s extensive bruising because he bathed the children, dressed L. D., and changed her diaper. There was testimony that L. D. would have been in so much pain from some of her injuries that the people around her

25

would have known that she was injured. Yet Rosenbaum took no action to protect her. This evidence allowed the jury to conclude that Rosenbaum had a shared criminal intent, *Coley*, 305 Ga. at 663 (4), and "constituted at least slight evidence from which a jury could conclude that, at a minimum, [Rosenbaum] was involved in the events leading up to and including [the aggravated assaults and child cruelty inflicted upon L. D.], and thus, was a party to the crimes." *Nunnally v. State*, ___ Ga. ___, ___ (3) (905 SE2d 550) (Case No. S24A0574, decided Aug. 13, 2024). See also *Delacruz v. State*, 280 Ga. 392, 395-396 (3) (627 SE2d 579) (2006); *Tabb v. State*, 313 Ga. App. 852, 855 (1) (723 SE2d 295) (2012); *Porter v. State*, 243 Ga. App. 498, 498-500 (1) (a) (532 SE2d 407) (2000), overruled in part on other grounds by *Virger*, 305 Ga. at 304, n. 16 (9).

(f) *Merger*

Rosenbaum argues that the trial court should have merged Counts 14 and 15 because, besides the date alleged in the indictment, the offenses are the same. We disagree. Count 14 alleged aggravated assault of L. D. for inflicting blunt-force trauma to her head, while Count 15 alleged first-degree child cruelty for maliciously causing L. D. excessive pain due to the blunt-force trauma to her head. (Although Rosenbaum

asserts that the counts alleged different dates, both counts alleged that the crimes occurred "on and between the 20th day of October, 2015 and the 10th day of November, 2015, the exact date of the offense being unknown.")

> Cruelty to children, but not aggravated [assault], requires proof that the victim was a child under the age of 18 who was caused cruel or excessive physical or mental pain. OCGA § 16-5-70 (b). Aggravated [assault], but not cruelty to children, requires proof [that a defendant commits an assault with any object, which, when used offensively against a person, is likely to or actually does result in serious bodily injury. OCGA § 16-5-21 (a) (2).] Therefore, each crime requires proof of at least one additional element which the other does not. Furthermore, the two crimes are not so closely related that multiple convictions are prohibited under other provisions of OCGA §§ 16-1-6 and 16-1-7. Accordingly, even if the same conduct establishes the commission of both aggravated [assault] and cruelty to children, the two crimes do not merge[.]

*Waits v. State*, 282 Ga. 1, 4-5 (2) (644 SE2d 127) (2007) (citations and punctuation omitted), overruled in part on other grounds in *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020) (appendix).

3. *Ineffective assistance of counsel*

Rosenbaum argues that he received ineffective assistance of trial counsel in several ways. We hold that he has failed to show reversible error.

(a) *Conflict of interest*

Rosenbaum argues that trial counsel performed deficiently because she had an actual conflict of interest that made it ethically impossible for her to represent both Rosenbaum and Jennifer Rosenbaum. In resolving the conflict-of-interest argument in Jennifer Rosenbaum's appeal, our Supreme Court declined to "address whether counsel developed an actual conflict of interest at trial," because "[a]ny potential conflict of interest was waivable, and the evidence shows that [Jennifer] Rosenbaum did waive her right to conflict-free counsel and that her waiver met the applicable constitutional requirements." *Rosenbaum v. State*, ___ Ga. ___, ___ (2) (___ SE2d ___) (Case No. S24A0448, decided Oct. 15, 2024). The same analysis applies to Rosenbaum's argument.

The Supreme Court set out the facts on the conflict issue as follows.

> Trial counsel represented both [Jennifer] Rosenbaum and Joseph [Rosenbaum] from the beginning. At the hearing on their motions for new trial, counsel testified that "in order that they both be represented (in) the best way possible, it seemed that they had to be joined," that separate attorneys "might pressure one or the other to testify against one or the other," and that the "will to get a plea and move on" might supplant the "will of the client." Counsel explained that both clients

28

wanted to present a "unified front" and were "adamant about not testifying against each other" and that [Jennifer] Rosenbaum herself initially came up with the idea of joint representation. [Jennifer] Rosenbaum — a third-year law student whom counsel considered to be "very, very intelligent" — was "very involved" and would research and "constantly" discuss all of the issues with counsel as part of a collaborative process. Joseph [Rosenbaum] also was involved in preparation of the defense. Counsel frequently discussed potential conflicts of interest with her clients together and with each separately. Counsel would often pause and consider whether there was a potential conflict such as antagonistic defenses. And she concluded that their defenses were not antagonistic.

In June 2017, the [s]tate filed a motion to disqualify trial counsel from joint representation. At the hearing on that motion, counsel presented written, signed waivers of any conflict from both clients and stated in her place that each client had consulted with independent counsel and were ready to be questioned by the trial court if the court so desired. In her written waiver, [Jennifer] Rosenbaum swore that she was "aware that a conflict of interest may possibly arise" from the joint representation; that she "realize[d] the potential hazards to her defense by continuing with such counsel under the onus of a possible conflict"; that she was "aware of her right to obtain other counsel"; and that, while she did "not concede the current existence of a conflict," she "waived any conflict that may arise and her right to hire or have appointed conflict-free counsel." Joseph[ Rosenbaum's] written waiver was

substantively identical. The potentially different levels of culpability, as reflected in the indictment, were discussed at the hearing. Trial counsel stated that extension of a plea offer to only one co-defendant could create a potential division of loyalties, but the prosecution did not extend any such offer prior to trial, and both [Jennifer] Rosenbaum and Joseph [Rosenbaum] "did not wish to pursue any type of plea offer" and advised counsel not to seek a plea offer. About that issue, because [Jennifer] Rosenbaum was a "law student" and Joseph [Rosenbaum] was "a correctional officer," counsel stated that "(t)hey cannot," and "do not wish to(,) take a plea." The trial court denied the [s]tate's motion to disqualify.

Soon after the hearing and order on the motion to disqualify, counsel sent [Jennifer] Rosenbaum and Joseph [Rosenbaum] a letter, at the trial court's suggestion, that reviewed the relevant ethics rule and its requirements regarding waivers of conflicts of interest. At the hearing on the motions for new trial, [the] Rosenbaum[s'] expert on the ethical and practice requirements of the Rules of Professional Conduct testified that in signed responses to the letters, each client acknowledged that he or she actually sought guidance from independent counsel about any potential conflicts, that each of them wished to waive the conflicts and pursue a joint defense despite the risks, that both parties were innocent of the charges and wished to present a united front, and that neither of them had any information that could be potentially useful or incriminating against the other. Counsel testified that she did not draft her clients' responses to her letter. The trial judge directed trial counsel

to let him know as soon as any conflict developed, and as the trial drew near, counsel updated the court on whether there was any potential for antagonistic defenses. Counsel testified that no conflict developed between the June 2017 denial of the motion to disqualify and the 2019 trial, and neither [Jennifer] Rosenbaum nor Joseph [Rosenbaum] ever indicated any concern about a conflict even though counsel consulted them frequently and separately about the issue throughout the case.

In its order[s] denying [Jennifer] Rosenbaum's [and Joseph Rosenbaum's] motion[s] for new trial, the trial court found that, "prior to trial, [Jennifer Rosenbaum and Joseph Rosenbaum] each executed a waiver of the conflict of interest as to joint representation, which comported with the standards of Rule 1.7 of the Georgia Rules of Professional Conduct" found in Bar Rule 4-102 (d). The trial court also found that neither co-defendant objected to trial counsel's joint representation until after the trial concluded and that [both Jennifer Rosenbaum and Joseph] Rosenbaum failed to demonstrate that an actual conflict of interest adversely affected [their] lawyer's performance.

*Rosenbaum*, ___ Ga. at ___ (2) (footnote three included in text; footnote four and punctuation omitted).

Then the Court held that any potential conflict of interest on the part of trial counsel was not unwaivable because

31

[t]he evidence showed that, prior to trial, both counsel and her clients consistently desired and planned a "unified front" that included a determination that neither co-defendant would or even could give testimony against the other; their anticipated defenses based on the co-defendants' representations to counsel were not antagonistic; and there were no plea offers, and both co-defendants rejected plea negotiations. While one of the co-defendants could possibly have changed his or her mind or story before or during trial, neither one did, and it cannot be said that adequate representation by a single attorney was reasonably unlikely.

*Rosenbaum*, ___ Ga. at ___ (2) (a).

The Court concluded, based on facts in large part equally applicable to Rosenbaum's case, that Jennifer Rosenbaum knowingly, voluntarily, and intelligently waived her right to conflict-free counsel, so that the trial court did not err by denying her motion for new trial on this ground. *Rosenbaum*, ___ Ga. at ___ (2) (c). Those facts

showed that [Jennifer] Rosenbaum, who had received more than two years of legal training, was highly motivated not to seek a plea offer and could understand the legal issues in the case, including the advantages and potential disadvantages of a common defense. Along with Joseph [Rosenbaum] — who also was involved in preparation of the defense — [Jennifer] Rosenbaum executed a written waiver in which she swore that she was aware of a possible conflict of interest as a result of the joint representation, realized its potential harmful consequences for her

32

defense, and was aware of her right to obtain other counsel; and in which she waived any conflict that may arise and her right to conflict-free counsel. Trial counsel explained that each co-defendant had consulted with independent counsel. Moreover, the relevant surrounding circumstances include not only [Jennifer] Rosenbaum's background and experience, but also counsel's continuing efforts, as directed by the trial court, to monitor the case for the development of any conflicts and to continue consultations with her clients regarding that issue.

*Rosenbaum*, ___ Ga. at ___ (2) (c) (footnote omitted). The only factual circumstance in Rosenbaum's case that differs from Jennifer Rosenbaum's case is that he did not have more than two years of legal training as she did, although he is college educated. But given the other circumstances — that he swore that he was aware of a possible conflict of interest as a result of the joint representation, realized its potential harmful consequences for his defense, and was aware of his right to obtain other counsel; that he waived any conflict that may arise and his right to conflict-free counsel; that trial counsel explained that Rosenbaum had consulted with independent counsel; and that counsel made continuing efforts to monitor the case for the development of any conflicts and to continue consultations with her clients regarding that issue — the fact

33

that he lacked legal training does not demand a different result from Jennifer Rosenbaum's.

We acknowledge that Rosenbaum argues that counsel was ineffective because a conflict of interest prevented her from pursuing a defense that Jennifer Rosenbaum was solely responsible and that he was ignorant of the abuse, given that the evidence of his own criminal misconduct was swamped by the evidence of her's. But the trial court found that counsel's failure to pursue such a defense was not borne out of a conflict of interest, a factual finding that we must accept. *Tolbert v. State*, 298 Ga. 147, 151 (2) (a) (780 SE2d 298) (2015). And, in any event, "[a] determination that defendants have waived the right to conflict-free counsel disposes of the need to evaluate the actual or potential ineffectiveness of counsel caused by the alleged conflicts of interest." *Rosenbaum*, ___ Ga. at ___ (2) (c) (citation and punctuation omitted). So the trial court did not err in denying Rosenbaum's motion for new trial on this ground.

(b) *Other alleged ineffectiveness*

To establish constitutionally ineffective assistance of counsel, a defendant must show that his counsel's performance was professionally deficient and that, but for such deficient performance, there is a

reasonable probability that the result of the trial would have been different. To prove deficient performance, a defendant must demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. There is a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. Overcoming that presumption requires an appellant to show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. If the defendant fails to satisfy either prong of [this] test, this [c]ourt is not required to examine the other.

*Pierce v. State*, ___ Ga. ___, ___ (11) (___ SE2d ___) (Case No. S24A0525, decided Oct. 1, 2024) (citations and punctuation omitted).

(i) *Accessory after the fact*

Rosenbaum argues that trial counsel performed deficiently by failing to request a jury instruction on the offense of accessory after the fact under OCGA §§ 16-2-20 and 16-10-50 and by failing to object when the state argued in closing that a person who covers up evidence after the fact is a party to the crime.

(A) *Failure to request jury instruction*

Trial counsel testified at the motion for new trial hearing that she discussed lesser included offenses with the Rosenbaums, but they did not want to request such

jury instructions. She specified that she did not ask for an instruction on accessory after the fact because it was not applicable, it would confuse the jury when the trial court was certainly going to charge the jury on party to the crime, and such an instruction could have led to a conviction.

"[T]rial counsel's testimony shows that [s]he pursued an 'all-or-nothing' defense, and that seeking an [accessory-after-the-fact] instruction would have been inconsistent with that defense theory." *White v. State*, 319 Ga. 367, 392 (6) (b) (903 SE2d 891) (2024). "The decision not to request a jury charge on a lesser included offense in order to pursue an all-or-nothing defense is a matter of trial strategy." *Blackwell v. State*, 302 Ga. 820, 825 (3) (809 SE2d 727) (2018) (citation and punctuation omitted). Rosenbaum has not shown that trial counsel was ineffective for making this strategic decision.

(B) *Failure to object to state's comments in closing*

Rosenbaum argues that trial counsel was ineffective for failing to object to this passage in the state's closing argument:

> So what does party to a crime mean? Party to a crime means a person is a party to a crime if that person directly commits the crime or intentionally helps in the commission of the crime, which could include

covering up the evidence after the fact. So if you are putting clothes on the child to hide the injuries, perhaps, from those around you, if you are putting IcyHot or you're tending to the injuries instead of getting care for that child, that's aiding and abetting in a criminal sense; that's party to a crime.

He argues that "covering up evidence after the fact," concerns accessory after the fact, not party to the crime, so trial counsel should have objected.

As detailed in Division 2 (e) above, "a person's presence, companionship, and conduct before, during, *and after the crime*[,]" is relevant to prove shared criminal intent, which the state must prove to convict a person as a party to the crime. *Coley*, 305 Ga. at 663 (4) (emphasis added; citation and punctuation omitted). So the state's reference to "covering up evidence" was not objectionable, particularly in light of the fact that the trial court properly charged the jury on parties to a crime. Because the passage in the state's closing argument was not objectionable, trial counsel was not ineffective for failing to object. *Cooper v. State*, 317 Ga. 676, 687 (2) (895 SE2d 285) (2023) ("the failure to make a meritless objection is not deficient performance") (citation and punctuation omitted).

(ii) *Failure to object to comments in closing that the Rosenbaums did not take responsibility*

Rosenbaum argues that counsel performed deficiently by failing to object when the state argued in closing that, unlike "the Turpins," a California couple who pled guilty to committing acts of child abuse, the Rosenbaums did not take responsibility for their actions, so the state had to try the case. He argues that trial counsel should have objected because the state's argument was an impermissible comment on his silence.

Trial counsel testified that she did not object because she "did not want to interrupt closing and bring attention to all of this. The more you interrupt, the more attention you bring to the stuff you don't want, and if you're not sustained then you're not –- you don't look good." Assuming without deciding that the state's argument was objectionable, "[t]his strategy was not unreasonable." *Young v. State*, 305 Ga. 92, 98 (6) (823 SE2d 774) (2019).

For these reasons, we affirm Rosenbaum's convictions.

*Judgment affirmed. Mercier, C. J., and Rickman, J., concur.*